IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 19, 2008

Charles R. Fulbruge III
Clerk

No. 07-70023

REGINALD W BLANTON

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States United States District Court
for the Western District of Texas

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Reginald W. Blanton, a Texas state prisoner, appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. In seeking habeas relief, Blanton challenges his conviction for capital murder and his sentence of death. The district court granted a certificate of appealability ("COA") on two issues regarding ineffective assistance of counsel raised in Blanton's federal habeas petition, and we granted COA on a third ineffective assistance of counsel issue. Blanton argues that (1) trial counsel was ineffective in his investigation and presentation of mitigation evidence during the sentencing phase of Blanton's trial, (2) trial counsel was ineffective in his failure to properly preserve Blanton's Batson claim, and (3) appellate counsel was

ineffective in her presentation of his Batson claim on direct appeal to the Texas Court of Criminal Appeals ("CCA"). For the following reasons, we affirm the judgment of the district court denying habeas relief.

I

Blanton seeks habeas corpus relief from his conviction for the murder of Carlos Garza. Blanton broke into Garza's San Antonio apartment, shot Garza twice in the head, and stole several pieces of jewelry and one hundred dollars. A Texas jury convicted Blanton of capital murder for killing Garza while committing robbery or burglary. See TEX. PEN. CODE § 19.03(a)(2) (defining capital murder). At the punishment phase of Blanton's trial, the jury returned a verdict finding that (1) there was a probability that Blanton would commit criminal acts of violence constituting a continuing threat to society, and (2) taking into consideration all of the evidence, including the circumstances of the offense and the petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a life sentence for petitioner. See TEX. CODE CRIM. PROC. art. 37.071, § 2(g). The trial judge sentenced Blanton to death.

Blanton appealed his conviction and sentence to the CCA. He argued, inter alia, that the trial court erred by overruling his Batson objections. The CCA affirmed Blanton's conviction and sentence, holding that the trial court did not err in overruling Blanton's objections to the prosecution's peremptory strikes because the strikes were supported by race-neutral justifications. See Blanton v. State, No. 74214, 2004 WL 3093219, *10-*12 (Tex. Crim. App. June 30, 2004) (unpublished).

Blanton then filed a state habeas petition. Among the numerous claims raised, Blanton contended that his trial and appellate counsel were ineffective for failing to argue his Batson claim fully, and for failing to preserve the record for the Batson claim. Blanton also argued that his trial counsel was ineffective

in his investigation and presentation of mitigating evidence that could have been used during the punishment phase of Blanton's trial.

The state habeas court judge, the same judge who had presided over Blanton's trial, recommended denial of habeas relief on all grounds. The state habeas court concluded that Blanton had not established that his trial or appellate counsel performed deficiently, nor had he established that he was prejudiced as a result of his representation at trial or on direct appeal. The CCA denied Blanton's habeas application in an unpublished order adopting the habeas trial court's recommendation, findings of fact, and conclusions of law. See Ex Parte Blanton, WR-61,443-01 (Tex. Crim. App. June 22, 2005).

Blanton then filed a federal habeas petition. He raised twenty claims, including ineffective assistance of trial and appellate counsel, but not a Batson claim. In a thorough and well-reasoned opinion, the district court denied habeas relief on all grounds. See Blanton v. Quarterman, 489 F. Supp. 2d. 621 (W.D. Tex. 2007). However, the district court granted COA on two issues raised by Blanton's petition: (1) whether habeas relief is warranted based on trial counsel's failure to investigate and present adequate mitigating evidence regarding Blanton's background; and (2) whether habeas relief is warranted based on appellate counsel's failure to present Blanton's Batson claim adequately on direct appeal. See id. at 714. We subsequently granted COA on a third issue: whether habeas relief is warranted based on trial counsel's failure to properly preserve Blanton's Batson claim, namely by objecting to the State's use of a jury shuffle and preserving evidence concerning the discriminatory nature of the jury shuffle. See Blanton v. Quarterman, No. 07-70023, 2008 WL 2871683, at *2 (5th Cir. July 24, 2008). We first address Blanton's two claims regarding the ineffectiveness of trial counsel, and then move to his claim regarding the ineffectiveness of appellate counsel.

II

We apply the standards of review set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Under AEDPA, when a federal habeas petitioner's claim has been adjudicated on the merits in a state court proceeding, a federal court may only grant habeas relief if the state court's adjudication of the claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) resulted in a decision that was based on an unreasonable interpretation of the facts in light of evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established Supreme Court precedent if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a different result. See Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court unreasonably applies clearly established federal law if it identifies the correct governing principle, but unreasonably applies that principle to the facts of the case. See Brown v. Payton, 544 U.S. 133, 141 (2005). An unreasonable application is different from an incorrect or erroneous application. See Schriro v. Landigran, 127 S. Ct. 1933, 1939 (2007). We defer to the state court's factual findings unless Blanton rebuts those findings with clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro, 127 S. Ct. at 1939-40.

In reviewing the district court's application of § 2254(d) to the state court decision, we review the district court's findings of fact for clear error and its conclusions of law de novo. See, e.g., Foster v. Johnson, 293 F.3d 766, 776 (5th Cir. 2002).

III

Blanton's ineffective assistance arguments, regarding both trial and appellate counsel, are governed by the Supreme Court's clearly established standard in Strickland v. Washington, 466 U.S. 668 (1984). See Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006) (recognizing that Strickland applies to ineffective assistance of appellate counsel claims). Strickland provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. 466 U.S. at 687. Under the first prong, Blanton must show that counsel's performance was deficient. See id. To establish deficient performance, Blanton must show that counsel's representation "fell below an objective standard of reasonableness." Id. at 688. This objective standard carries a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. Id. at 687-91. In reviewing counsel's performance, we make every effort to eliminate the distorting effects of hindsight, and attempt to adopt the perspective of counsel at the time of the representation. See id. at 690.

Under the second prong, Blanton must show that his counsel's deficient performance resulted in prejudice. See id. at 687. To satisfy the "prejudice" prong, Blanton must establish that, but for his counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. Id. at 694. Blanton's Strickland claim fails if he cannot establish either the deficient performance or prejudice prong; a court need not evaluate both if a he makes an insufficient showing as to either. See id. at 697; Foster v. Johnson, 293 F.3d 766, 782 n.10 (5th Cir. 2002).

The state habeas court concluded that Blanton established neither deficient performance nor prejudice with respect to his Strickland claims. The district court, applying the standard set forth in AEDPA, found that this conclusion was not unreasonable. Blanton argues that the state habeas court unreasonably applied Strickland to the facts of his case. Therefore, the question

5

before us is whether the state habeas court reasonably concluded that Blanton's ineffective assistance claims failed to satisfy either prong of Strickland. See Schaetzle v. Cockrell, 343 F.3d 440, 444 (5th Cir. 2003). In exercising our habeas review under § 2254(d), we review only the ultimate decision of the state court, and not the specific contents of its reasoning or opinion. See St. Aubin v. Quarterman, 470 F.3d 1096, 1100 (5th Cir. 2006), cert. denied, 127 S. Ct. 2133 (2007); Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

A

The district court granted COA on the issue of whether Blanton's trial counsel was ineffective in his investigation and presentation of mitigating punishment-phase evidence. In assessing counsel's performance in this context, we look to how counsel prepared for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and what results counsel could have reasonably expected from those leads. See Neal, 286 F.3d at 237. The reasonableness of counsel's investigation involves "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527 (2003). Looking to the ABA Guidelines, the Supreme Court has recognized that "investigation into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence." Id. at 524. In reviewing the issue of prejudice at capital sentencing we weigh the quality and quantity of the available mitigating evidence, including that presented in post-conviction proceedings, along with the any aggravating evidence. See Williams, 529 U.S. at 397-98. We then ask whether the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about imposing the death penalty. See TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(2) (stating that the jury must unanimously answer "no"

to the mitigation special issue to impose the death penalty); Neal, 286 F.3d at 241.

The State's punishment evidence included a long history of Blanton's trouble with the law, including participation in gang activity, theft, unlawful possession of a handgun, and possession of marijuana. The State also presented evidence of Blanton's failure to abide by the conditions of his juvenile probation, his long history of abusing marijuana and alcohol, and his assault of another inmate while awaiting his capital murder trial.

Blanton's trial counsel prepared his mitigation case by interviewing Blanton and his family members, and having Blanton examined by Dr. Schroeder, a court appointed psychological expert. Dr. Schroder found that Blanton possessed average mental and academic capabilities, and she described him as highly manipulative and unforthcoming during his interview. She concluded that Blanton's past indicated long-term impulsiveness and a failure to conform to social norms of lawful behavior, suggesting a pervasive pattern of disregard for the rights of others. Dr. Schroeder diagnosed Blanton as likely suffering from antisocial personality disorder, and told Blanton's trial counsel that she would "not be much help" in terms of mitigation. Trial counsel decided not ask Dr. Schroeder to testify, and did not have Blanton evaluated by any other psychological professional. Counsel also utilized a court-appointed mitigation expert. According to testimony during the state habeas proceeding, this was the first use of a mitigation expert for a capital trial in Bexar County. The mitigation expert obtained and reviewed some of Blanton's medical, prison, and social services records; she also interviewed members of Blanton's family. In total, the mitigation expert spent over sixty hours preparing her report.

At punishment, trial counsel presented the following evidence. A church pastor who had known Blanton and his family opined that Blanton is a "God-fearing person" who knows right from wrong. The mitigation expert testified as

to the results of her investigation into Blanton's background. Specifically, she stated that Blanton's mother was pushed down a flight of stairs while pregnant with Blanton. Blanton had an unsupervised adolescence, began smoking marijuana at age eleven, and experienced violence on a daily basis. The mitigation specialist believed Blanton abused drugs to escape from his difficult life, and joined a gang to replace the safety and protection his family did not provide. Blanton's drug addiction was not treated during his previous periods of detention. Still, the mitigation specialist found Blanton "very intelligent," as he had earned his GED and attempted to inquire into joining the military or attending college. The prosecution conducted a skillful cross-examination of the mitigation specialist, focusing on her lack of experience.

Mrs. Blanton testified regarding her difficult pregnancy with Blanton, including the physical and verbal abuse she suffered at the hands of her husband and stepfather while pregnant. She stated that Blanton was born "breech," swallowed fluid and was blue at birth. As a child, Blanton was smart but had trouble sitting still, so she allowed the school to place him on Ritalin. Her children witnessed her husband physically abuse her and assault Blanton's older sister. After his parents divorced, Blanton began having trouble at school and his relationship with his mother suffered. Blanton also had a bad relationship with his father and possessed significant anger towards him.

In his habeas petition, Blanton argues that trial counsel was ineffective for (1) failing to provide Dr. Schroeder with complete copies of Blanton's birth records and childhood medical records with which to conduct her evaluation, and (2) failing to investigate and present evidence of Blanton's background, specifically with respect to prior medical issues, drug abuse, and abusive family life during childhood. According to Blanton, the evidence that trial counsel failed to uncover would have established that he suffered from organic brain damage. Blanton attached exhibits to his state habeas filing, including

childhood medical records concerning his difficult birth and childhood injuries, school records, and reports from two psychological professionals, Gordon Potter and Dr. Jim Cox. Mr. Potter and Dr. Cox concluded that Blanton likely suffered from organic brain damage. They reached this conclusion based on the combined effects of Blanton's childhood injuries (including a childhood bike accident where Blanton injured his head), his difficult upbringing, and his abuse of damaging inhalants. According to Mr. Potter's report, organic brain damage to the frontal lobe of Blanton's brain would fundamentally alter how he perceived the world, reacted to stress, controlled impulses, and conformed to social norms.

During Blanton's state habeas proceeding, lead trial counsel testified that he and the mitigation specialist had trouble obtaining some of Blanton's medical records from another state. He admitted that if they had looked sooner, they likely could have obtained them. Lead trial counsel admitted that the prosecution "shredded" his mitigation expert on cross examination, but stated that the mitigation expert provided the jury with useful information nonetheless. In hindsight, trial counsel would have used the mitigation expert's findings but not called her as a witness because of her inexperience.

Blanton also called Mr. Potter as a witness at the state habeas hearing to explain why he felt Blanton had organic brain damage. Mr. Potter testified to the details of Blanton's difficult birth, including his diagnosis with an Apgar score of 1 (the lowest possible score) because he was oxygen deprived at birth. Mr. Potter also explained how Blanton's childhood injuries and abusive upbringing placed stress on Blanton that could cause brain damage. On cross-examination, Mr. Potter admitted that there was no hard evidence of organic brain damage, and that at fifteen days old Blanton had a normal Apgar score. He also admitted that antisocial personality disorder can cause many of the same behaviors as organic brain damage and that oxygen deprivation at birth does not necessarily result in organic brain damage.

The State called Dr. Sparks, psychiatrist and medical director of Bexar County jail. Dr. Sparks' testimony largely refuted Mr. Potter's; he focused on the lack of objective evidence showing Blanton's alleged organic brain damage. Dr. Sparks also testified that he was more qualified to diagnose organic brain disorder than Mr. Potter, because he was a medical doctor and Mr. Potter was not.

The state habeas court ultimately concluded that Blanton failed to establish either deficient performance or prejudice under Strickland, and the district court found this to be a reasonable conclusion under the AEDPA standard. As in the district court, under § 2254 Blanton must establish that the state habeas court reached an unreasonable conclusion as to trial counsel's decision to end the investigation and proceed with the evidence obtained up to that point. See Wiggins, 539 U.S. at 521. Blanton must also show that the state habeas court reached an unreasonable conclusion as to prejudice. We agree with the district court that Blanton has not established that the state habeas court was unreasonable on either prong.

As to deficient performance, we note that Blanton presented no evidence to suggest Dr. Schroeder was unqualified or that trial counsel had reason to question the results of the psychological examination she performed. Blanton also presented no evidence at state habeas to suggest how easily his childhood medical records could have been obtained by trial counsel. Habeas testimony by trial counsel showed counsel did recover some medical and social services records. Trial counsel also testified that he and the mitigation specialist attempted to obtain further medical records but could not do so because of difficulties arising from the records being held in a different state. Further, Blanton provided no evidence as to how his trial counsel could have reasonably uncovered Blanton's abuse of inhalants)) no evidence produced at state habeas indicated that Blanton or any of his family members mentioned use of inhalants

to Blanton's trial counsel. In fact, there is no record that Blanton mentioned inhalant abuse prior to his conviction. Nor has Blanton shown that his childhood medical records or trial counsel's interviews with Blanton's family provided information that would lead a reasonable attorney to investigate further any psychological disorder or brain damage. Blanton's trial counsel cannot be deficient for failing to investigate where no reasonable lead was available. See Wiggins, 539 U.S. at 527.

Trial counsel knew that Blanton had suffered a difficult, oxygen-deprived birth. Trial counsel also knew of Blanton's troubled childhood, and that he had abused non-inhalant drugs. However, trial counsel also knew that Blanton was smart enough to obtain his GED, that he had been described by Dr. Schroeder as manipulative, and that Dr. Schroeder did not identify any likelihood of brain disorder. Finally, while Blanton's mitigation expert was effectively cross-examined by the prosecution, Blanton's trial counsel were the first to utilize a mitigation specialist for a Bexar County capital trial. While in hindsight, it is easy to say that trial counsel could have done more, we find the state habeas court reasonable in its conclusion that trial counsel performed reasonably based on the context and circumstances at the time of the representation. See Strickland, 466 U.S. at 690 (stating that courts must be careful to avoid hindsight bias in evaluating counsel's performance).

We also hold that, based on the mitigation evidence produced in the state habeas proceeding, the state habeas court reached a reasonable conclusion as to prejudice. Blanton did not establish that Dr. Shroeder would have altered her diagnosis based on any of the evidence presented in the state habeas proceeding. The evidence of organic brain damage presented by Mr. Potter and Dr. Cox was persuasively rebutted by Dr. Sparks))so much so that the state habeas court reached a factual conclusion that Blanton did not suffer from organic brain damage. Blanton has not rebutted this conclusion with clear and convincing

evidence to the contrary. See 28 U.S.C. § 2254(e)(1). While we agree with Blanton that the medical records showing evidence of his childhood injuries and his abusive home life could have provided more detail to the jury at punishment, the substance of this mitigating evidence had already been presented through the testimony of the mitigation specialist and Mrs. Blanton. Moreover, the mitigating evidence presented by Blanton during the state habeas proceeding was not nearly as strong as that submitted by petitioners in recent cases in which the Supreme Court has found prejudice from trial counsel's failure to present mitigation evidence.[1] Accordingly, we hold that the state habeas court reasonably applied Strickland in concluding that Blanton was not prejudiced.

In sum, we agree with the district court that the state habeas court reasonably applied Strickland in denying Blanton's ineffective assistance claim regarding his trial counsel's investigation and presentation of punishment-phase mitigating evidence.

---

[1] In Rompilla v. Beard, the evidence which counsel failed to uncover and present)) despite the fact that the prosecutors provided defense counsel with the file including the evidence)) showed that: during Rompilla's childhood he was beaten by his father with fists, straps, belts and sticks; that Rompilla's father locked him and his brother in a wire mesh dog pen that was filthy and excrement-filled; and that Rompilla grew up in a home with no indoor plumbing and was not given proper clothing by his parents. 545 U.S. 374, 391-92 (2005).

In Wiggins, trial counsel failed to present evidence that Wiggins suffered consistent abuse during the first six years of his life. He also suffered "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." Wiggins was homeless for portions of his life and was deemed to have diminished mental capacities. 539 U.S. at 535.

In Williams, the state court failed to address the fact that Williams had turned himself in, expressed remorse for his actions, and cooperated with the police. 529 U.S. at 398. Trial counsel failed to present evidence that Williams had been committed at age 11, and that documents prepared in connection with his commitment detailed dramatic mistreatment and abuse during his early childhood. The commitment documents also included testimony that he was "borderline mentally retarded," had suffered numerous head injuries, and might have mental impairments organic in origin. 529 U.S. at 370-71.

In each of these cases, trial counsel presented less mitigation evidence at trial than did Blanton's counsel. Further, the mitigation evidence that the attorneys failed to uncover was shocking and starkly different than that presented at trial. Blanton claims that his counsel should have put on new, different evidence of psychological damage and more detailed evidence of his difficult birth and childhood. Blanton's counsel had a psychological evaluation done, but the conclusion was not favorable. Blanton's counsel also presented evidence, albeit in general terms, of Blanton's difficult birth and childhood. As such, Blanton's claim of prejudice is dissimilar from those presented in Rompilla, Wiggins, or Williams.

B

We granted COA on the issue of whether Blanton's trial counsel was ineffective in failing to properly preserve his Batson claim for appeal. Specifically, Blanton claims counsel was ineffective for failing to properly preserve objection to the prosecution's use of a jury shuffle and failing to preserve evidence concerning the discriminatory nature of the shuffle. Blanton contends that trial counsel should have immediately objected to the shuffle, which he argues was done to eliminate black jurors, and should have done more to preserve evidence of the shuffle in the record for appeal.[2] In reviewing a claim alleging ineffective assistance of appellate counsel we apply the traditional Strickland standard, described in Part III, supra.

The state habeas court rejected Blanton's ineffective assistance of trial counsel claim regarding the jury shuffle, holding that Blanton had not shown deficient performance or prejudice. The district court found this conclusion reasonable under the AEDPA standard. The pertinent facts are as follows.

Five of the one hundred prospective jurors on Blanton's venire panel were African-American. In the original panel order, three African-American venire members were placed amongst the first twenty positions, and would almost certainly have been questioned during jury selection. The African-American venire members were in positions 2, 4, 20, 82, and 98. Before any questioning of the venire panel, the prosecution requested a jury shuffle. This procedure results in a random reshuffling of the panel members' positions. See TEX. CODE CRIM PROC. art. 35.11. After the jury shuffle, the African-American venire

---

[2] Blanton did not present a Batson claim in his federal habeas petition, and he does not present a Batson claim to this court. See Blanton v. Quarterman, 489 F.2d at 684 n.95. According to Blanton's brief on appeal, he decided not to proceed with a Batson claim because the evidence and arguments necessary to make such a claim were not fully presented to the CCA on direct appeal. Blanton contends that the jury shuffle component of his argument was not exhausted, and therefore, that it would have been pointless to raise his Batson claim in federal habeas. We make no statement as to whether such a claim would in fact be exhausted. We provide the facts and analysis related to Blanton's Batson claim only to the extent necessary to measure the effectiveness of Blanton's counsel.

members were in positions 64, 68, 76, 87, and 90. Blanton's trial counsel raised no objection at the time of the shuffle.

Later, when the prosecution exercised a peremptory strike of African-American venire member Michelle Johnson, Blanton's trial counsel objected based on Batson v. Kentucky. See 476 U.S. 79, 89 (1986) (holding that the Equal Protection Clause forbids prosecutors from challenging potential jurors solely on account of their race). The prosecutor responded with a race-neutral explanation for the peremptory strike involving Johnson's views on the death penalty and understanding of criminal law.[3] Although trial counsel attempted to refute this explanation, the court overruled the objection as to Johnson.

At this point, trial counsel lodged a second Batson challenge regarding Johnson and argued that the prosecution should be compelled to explain why they sought a jury shuffle. The trial court did not require the prosecution to explain the shuffle, and again overruled the Batson challenge. Trial counsel then asked the court to include pre-shuffle and post-shuffle evidence of the placement of the venire members, and to have the court provide a statistical analysis regarding this evidence. The court denied the request for a statistical analysis but granted the request to have the original order of the one hundred venire members included as part of the record.

Blanton's trial counsel also raised a Batson challenge to the prosecution's peremptory strike of Ann Henderson, which the trial court overruled based on the prosecution's race-neutral reasons. The third African-American venire member questioned was struck for cause.

In his state habeas petition, Blanton argued that trial counsel was ineffective for failing to object to the racially motivated jury shuffle when the shuffle actually occurred. He contended that Batson requires the trial court to

---

[3] For a detailed description of the prosecutor's race-neutral explanation, see Part III Section C, infra.

consider all relevant circumstances when determining whether a defendant has made the requisite showing of purposeful discrimination.  See Batson , 476 U.S. at 96.  Thus, Blanton's argument then and now is that counsel should have known the jury shuffle would be a  relevant circumstance in a future Batson challenge if the State subsequently used race-based peremptory strikes against African-Americans.  With that knowledge, counsel should have timely objected to the shuffle in order to preserve it to shore up a future Batson claim.  Further, Blanton argues that trial counsel was ineffective for failing to ensure that  the record contained adequate evidence to raise the issue of the discriminatory jury shuffle on appeal.

After an evidentiary hearing, the state habeas court found that Blanton's claims of ineffective assistance regarding the jury shuffle failed to satisfy either prong of the Strickland test, in part because at the time of Blanton's trial neither Texas nor federal law recognized any relationship between a jury shuffle and a Batson claim.  The federal district court found the state habeas court's resolution of this claim to be a reasonable application of Strickland.  Blanton v. Quarterman, 489 F. Supp. 2d. at 690.  Because Blanton has not shown that his trial counsel performed deficiently in violation of Strickland, we agree with the district court.

At the time of Blanton's 2001 trial, no case law indicated that Batson applied to an allegedly discriminatory jury shuffle.  On the contrary, in Ladd v. State the Texas CCA refused to extend Batson to jury shuffles.  3 S.W.3d 547, 563 n.9 (Tex. Crim. App. 1999) ("[o]ne scholar has argued that, logically, Batson should extend to jury shuffles . . . [w]e wish to make it clear, however, that we do not endorse such a view.").  Under Texas law, either side can call for a shuffle once prior to the start of voir dire.  See TEX. CODE CRIM. PROC. art. 35.11; Chappell v. State, 850 S.W.2d 508, 511 (Tex. Crim. App. 1983).  The statute does not require the side requesting the shuffle to explain its reasons for doing so.  As

trial counsel testified at the state habeas hearing, he did not detect discrimination in the shuffle until the State peremptorily struck venire member Johnson, and at that point he made a Batson challenge raising the issue of the jury shuffle and its discriminatory effect on the jury selection process. The prosecutor testified that she requested the jury shuffle based not on race, but on the occupations of the venire members. Specifically, the prosecutor stated that she exercised jury shuffles in order to move teachers and social workers back and to move accountants, former military personnel, and law enforcement personnel forward. The state habeas court accepted the prosecutor's race-neutral justification for the jury shuffle.

We cannot find the state habeas court's conclusion that trial counsel's performance was not deficient to be an unreasonable application of the first prong of Strickland. Based on the law regarding jury shuffles and Batson challenges available to him at the time, it was reasonable for trial counsel to believe that the prosecution could request a jury shuffle without cause, and that a jury shuffle alone was not an adequate basis for a Batson challenge. Blanton has not presented evidence sufficient to overcome the presumption, required by Strickland, that trial counsel acted within the range of reasonableness by delaying a Batson challenge until a peremptory strike actually occurred. When the peremptory strikes against African-Americans did occur, counsel raised timely Batson challenges and attempted to support them by reference to what he then believed to be a racially-motivated jury shuffle. Far from being deficient, with this argument counsel actually anticipated what the Supreme Court would find two years later in Miller-El v. Cockrell: that a racially-motivated jury shuffle, along with other factors indicating intent to exclude African-Americans, can "raise a suspicion" of purposeful discrimination and rebut a prosecutor's race-neutral justification for a peremptory strike. See 537 U.S. 322, 346 (2003) ("Miller-El I") (noting, however, that the jury shuffle alone

16

"might not be denominated as a Batson claim because it does not involve a peremptory challenge"). Counsel attempted to persuade the court that the jury shuffle should be considered evidence rebutting a race-neutral explanation for the peremptory strikes, but the court disagreed. As such, we find that trial counsel was not deficient in raising the jury shuffle issue during Johnson's Batson challenge rather than at the time of the shuffle.

Further, trial counsel successfully preserved the Batson challenges for appeal, as indicated by the CCA ruling on these claims on the merits. See Blanton v. State, 2004 WL 3093219, at *10-*11. He anticipated that raising the shuffle issue again on appeal would require evidence of the venire order, and he successfully petitioned the court to enter the original list into evidence. Although this apparently did not occur, for unknown reasons, Blanton fails to identify any facts showing it was objectively unreasonable for trial counsel to believe the court's order would be complied with. We accordingly conclude that trial counsel was not deficient in his preservation of evidence regarding the jury shuffle and Batson challenges for appeal.

In his brief following our granting COA on this issue, Blanton raises additional claims regarding trial counsel's failure to preserve the record.[4] We agree with the district court that Blanton has failed to raise these specific claims in his federal habeas petition. See Blanton v. Quarterman, 489 F. Supp. 2d. at 682 n.93. Since Blanton did not raise these claims in the district court, we cannot consider them. See Beazley v. Johnson, 242 F.3d 248, 271 (5th Cir. 2001)

---

[4] Specifically, Blanton argues in his supplemental brief that trial counsel was ineffective for failing to preserve evidence of a discriminatory statement allegedly made by the prosecutor. He maintains that prior to voir dire, the prosecutor described a situation in another Bexar County trial where an African-American juror hung the jury. Further, he argues that trial counsel was ineffective for failing to preserve evidence of the fact that three out of the five total African-American venire members were seated in the first twenty of the venire panel. With regard to the first claim, it should be noted that at the state habeas hearing, the prosecutor testified unequivocally that she had never made such a statement and had no personal knowledge of any such situation ever occurring in Bexar County.

(finding that to the extent defendant did not raise a federal habeas claim in the district court, the court of appeals could not consider it).

Accordingly, we agree with the district court that "[a]ny lack of success petitioner's Batson claims might have achieved on direct appeal cannot be laid at the feet of [Blanton's] trial counsel." Blanton v. Quarterman, 489 F. Supp. 2d at 489. Certainly, the clarification of the relationship between jury shuffles and Batson challenges in Miller-El I indicates to us now that an immediate objection to a suspect jury shuffle may help support a future Batson challenge. But to require such knowledge of an attorney before Miller-El I was decided would be a prime example of the "distorting effects of hindsight" that Strickland requires us to avoid. See Strickland, 466 U.S. at 690. Considering the law at the time, trial counsel responded reasonably and even with foresight into the development of the law in attempting to use the jury shuffle to buttress his Batson challenges. As Blanton has not met his burden of showing both deficient performance and prejudice, we forgo discussion of the prejudice prong and hold that the state habeas court reasonably applied Strickland in denying Blanton's ineffective assistance claim.

C

The district court also granted COA on Blanton's claim that his counsel on direct appeal to the CCA provided ineffective assistance for failing to adequately present his Batson claim regarding venire member Michelle Johnson. Blanton specifically argues that his appellate counsel should have addressed the prosecution's use of a jury shuffle, which Blanton contends was done to eliminate African-American jurors. Blanton also argues that appellate counsel should have done more to ensure that the record included the information necessary to make such an argument.

The state habeas court rejected Blanton's ineffective assistance of appellate counsel claim, holding that Blanton had not shown deficient

performance or prejudice. In reviewing a claim alleging ineffective assistance of appellate counsel, we again apply the traditional Strickland standard described in Part III, supra.

As described at Part III Section B above, Michelle Johnson was the first African-American juror peremptorily struck by the prosecution. Blanton's trial counsel raised a Batson challenge to this strike, and when asked for a race-neutral explanation the prosecution stated that Johnson: (1) suggested that the death penalty was against her religious beliefs; (2) appeared confused about the law regarding imposition of the death penalty; (3) stated that she believed that capital punishment was appropriate only for premeditated cases; and (4) testified she would "have to be convinced without any doubt whatsoever" in order to return a guilty verdict.[5] Trial counsel responded that Johnson had received different questioning than other panel members, and that in response to re-examination by defense counsel she stated that she could accurately apply the law. The trial court overruled the objection as to Johnson. Then, trial counsel lodged a second Batson challenge regarding Johnson and argued that the prosecution must explain the reasons for requesting the jury shuffle. The trial court overruled the objection a second time and did not require an explanation for the jury shuffle. Trial counsel did, however, successfully petition the court to include the original order of the one hundred venire members in the record, although this did not occur for unknown reasons.

The state habeas court found that, on direct appeal, Blanton's appellate counsel also requested inclusion of the juror lists in the record.[6] In her brief,

---

[5] Johnson's jury questionnaire indicated some ambivalence regarding her ability to impose the death penalty. However, her questionnaire stated that she had no strong feelings one way or the other about the death penalty. Johnson's voir dire testimony indicated new sources of ambivalence—specifically with regards to her testimony that the death penalty was somewhat "against [her] religious beliefs" and that it was "really up to God, life and death."

[6] Blanton presents no evidence showing that this factual determination was erroneous.

appellate counsel raised a point of error asserting that the trial court erred in overruling Blanton's Batson objections to venire members Johnson and Henderson. Appellate counsel's brief argued that the prosecution's race-neutral justifications were not credible with respect to Johnson and Henderson. Appellate counsel attempted to undermine the prosecution's race-neutral justifications by arguing that the prosecution engaged in disparate questioning of these two black panel members, and that similarly-situated non-black venire members were not struck by the prosecution. Appellate counsel's brief also mentioned, in a footnote, the fact that Batson arguments logically could be extended to a Texas prosecutor's use of the jury shuffle mechanism. In Blanton's brief on appeal, appellate counsel did not make a specific argument that evidence of a racially discriminatory jury shuffle undermines the credibility of the prosecution's race-neutral justifications for striking individual jurors.

Appellate counsel filed her brief with the CCA in December 2002. In February 2003, the Supreme Court issued its opinion in Miller-El I. In Miller-El I, the Supreme Court looked to the discriminatory use of a Texas jury shuffle, among other things, in analyzing the credibility of race-neutral reasons proffered by the prosecution for exercising peremptory strikes. Miller-El I, 537 U.S. at 346.[7] The CCA did not issue its decision prior to the Supreme Court's decision in Miller-El I. Nothing in the record suggests that Blanton's appellate counsel sought leave to file supplemental briefing to address Miller-El I, nor did appellate counsel mention the case in her motion for rehearing to the CCA. Throughout the course of the appeal, appellate counsel never made any argument regarding the discriminatory jury shuffle beyond the footnote in her original brief. Sixteen months after Miller-El I, in June 2004, the CCA affirmed

---

[7] Miller-El I dealt with Miller-El's Batson challenges at the COA stage. See Miller-El I, 537 U.S. at 348. Eventually, in Miller-El II, Miller-El v. Dretke, 545 U.S. 231(2005), the Supreme Court decided that habeas relief should be granted to Miller-El based on the state's Batson violations during his original trial. See id. at 266.

the trial court's decision on the Batson challenges, finding that the record supported the race-neutral reasons given by the prosecution. See Blanton v. State, 2004 WL 3093219 at *10-*12. The CCA also reaffirmed its prior holding that a Batson challenge does not apply to the prosecution's request for a jury shuffle. See id. at *10 n.17 (quoting Ladd, 3 S.W.3d at 575 n.9). The CCA did not mention Miller-El I in its opinion.

In his state habeas petition, Blanton argued that appellate counsel was ineffective in her presentation of his Batson claim because counsel should have raised the discriminatory nature of the jury shuffle. Blanton also argued that appellate counsel should have done more to preserve the Batson claims for review. Blanton posited that if the importance of the jury shuffle was not clear based on Batson alone, it certainly became clear when the Supreme Court decided Miller-El I. The state habeas court concluded that Blanton did not show appellate counsel to have performed deficiently. The state habeas court also concluded that Blanton was not prejudiced by appellate counsel's representation. The federal district court found the state habeas court's resolution of this claim to be a reasonable application of Strickland. Blanton v. Quarterman, 489 F. Supp. 2d. at 709-10. For the following reasons, we agree with the district court.

We share the district court's concern over the fact that Blanton's appellate counsel never addressed Miller-El I in the sixteen months between when the Supreme Court issued the decision and the time the CCA decided Blanton's appeal. See Blanton v. Quarterman, 489 F. Supp. 2d at 713. That being said, we pretermit consideration of appellate counsel's performance because we conclude that the state habeas court's conclusion as to prejudice was reasonable. See Strickland, 466 U.S. at 697; Henderson , 460 F.3d at 666.

To evaluate the state habeas court's conclusion as to prejudice, we must attempt to predict the likelihood that the outcome on appeal would have changed if Blanton's appellate counsel had made the jury shuffle argument made at state

21

habeas. In determining whether there is a reasonable probability that the CCA would reach a different conclusion, we keep in mind that the CCA's standard of review accords "great deference" to the trial court's rulings as to the credibility of a prosecutor's reasons for exercising a peremptory strike, and that the CCA overturns the trial court only if the ruling is clearly erroneous. See Howard v. Gramley, 225 F.3d 784, 790 (7th Cir. 2000) (noting the importance of the appellate court's standard of review); Herron v. State, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002) (explaining the clearly erroneous standard for review of Batson credibility determinations).

In rejecting Blanton's Batson claim on direct appeal, the CCA addressed a number of arguments regarding venire member Johnson. The CCA was not convinced by Blanton's arguments regarding the alleged disparate questioning of Johnson, or the supposedly similar non-black panelists whom the prosecution did not strike. The CCA determined that Johnson's questioning was sufficiently explained by suspect answers to earlier questions regarding the death penalty and questions regarding the State's burden of proof. The CCA also held that the eventual panel members who served on the jury were not similarly situated to Johnson because they gave different answers regarding premeditation. Blanton v. State, 2004 WL 3093219 at *10-11. Finally, the CCA recognized that "the fact that a prospective juror vacillates about her ability to choose the death penalty, despite personal beliefs, is a valid and neutral reason to strike that person." Id. at *11. Because these arguments were found insufficient by the CCA in the first instance, Blanton's challenge is a limited one: his claim is that the addition of the jury shuffle argument would have a reasonable probability of tipping the scales in his favor on direct appeal. We note that in federal habeas, Blanton must go even further to show that the state habeas court was unreasonable in

reaching a contrary conclusion.[8]

During the state habeas court's evidentiary hearing, Blanton's lead trial counsel and the lead prosecutor testified regarding the circumstances of the jury shuffle. Blanton presented the positions of the African-American venire members both before and after the allegedly discriminatory shuffle: three were positioned in the first twenty prior to the shuffle, after the shuffle the first African-American was at position 64. Based on the concentration of African-American panel members at the front, he argued there was a great likelihood that a shuffle would move them back in the order. The prosecutor testified that she requested the jury shuffle based not on race, but on the occupations of the venire members. The state habeas court accepted the prosecutor's race-neutral justification for the jury shuffle.

The district court questioned the prosecutor's race-neutral justification for the jury shuffle. In fact, the district court stated that it found "no correlation between the occupation based concerns voiced by the lead prosecutor . . . and the composition of petitioner's initial venire panel." Blanton v. Quarterman, 489 F. Supp. 2d. at 704. In reaching this conclusion, the district court noted that "the teachers in petitioner's jury venire were spread out fairly evenly." Id. at 704 n.135. The district court's analysis does not include reference to the other occupation groups with which the prosecutor indicated concern. Taking into consideration the teachers, social workers, accountants, law enforcement personnel, and former military personnel on Blanton's original venire panel, our

---

[8] The district court was not as convinced that Johnson's disparate questioning was justified. See Blanton v. Quarterman, 489 F. Supp. at 703-04 & n.133. The district court also questioned the CCA's casting Johnson as a "vacillating juror." Id. at 713. We believe that the CCA's conclusions regarding Johnson's ambivalence towards the death penalty and her confusion regarding the State's burden of proof are supported by the voir dire record. However, we also feel it important to avoid too much second guessing of the conclusions already reached by the CCA. Such second guessing leads us into an actual Batson analysis, rather than analysis of the Strickland claim that is properly before us. Because Blanton has not raised a Batson claim in federal habeas, we focus instead on the arguments of which the CCA was deprived based on his appellate counsel's representation and whether those new arguments create a reasonable probability of a different outcome on direct appeal.

review of the record indicates that the prosecutor's stated justification for the jury shuffle finds some support in the record.[9] We also note that the state habeas court judge presided over the voir dire in this case; in accepting the lead prosecutor's race-neutral justification, the judge reached a conclusion that reflected a positive credibility determination regarding the prosecutor's testimony. See Goodwin v. Johnson, 224 F.3d 450, 457 (5th Cir. 2000) (indicating the high burden that a habeas petitioner faces in order for this court to reverse an initial fact-finder's credibility determination). We do not find that the record provides clear and convincing evidence to rebut the state habeas court's conclusion accepting the prosecutor's race-neutral justification for the jury shuffle. See 28 U.S.C. § 2254(e)(1).

In ruling on the likely effect of appellate counsel's representation, the state habeas court also recognized that the evidence of racial animus in Blanton's case was markedly different from Miller-El I. As such, the habeas court concluded that a jury shuffle argument along the lines of that presented in Miller-El I would not have provided relief to Blanton.[10] We agree with the state habeas court that the evidence of race-based discrimination carried out by the

---

[9] A review of the juror questionnaires shows that the groups identified by the lead prosecutor were seated in the following positions in Blanton's original venire panel. Teachers, whom the prosecutor sought to move back, were at 3, 23, 31, 44, 53, 75, 98 (also military), and 100. There were no venire members who could be identified as social workers. In terms of the occupations the prosecutor sought to move forward, accountants were seated at positions 57 and 80. A local law enforcement worker was seated in position 81. Venire members with military service experience were scattered, but more heavily concentrated at the end of the original venire list, seated at positions, 2, 16, 32, 33, 35, 40, 61, 71, 77, 79, 80, 90, 93, 98 (also teacher), and 99. While these numbers might not provide the strongest support for the prosecutor's rationale, they also do not present clear and convincing evidence to undermine the state habeas court's acceptance of the prosecutor's justification.

[10] Unlike Blanton's case, in Miller-El I the venire members were not retained for more than one week. See Miller-El I, 537 U.S. at 334. Therefore, venire members sent to the end of the line in Miller-El's case were less likely to be questioned than in Blanton's case. Further, in undermining the credibility of the prosecution's race-neutral reasons, Miller-El put forth startling evidence of the prosecution's pattern of racially motivated peremptory strikes, and long-standing office policy of racial discrimination in jury selection by the Dallas County prosecutor's office. See id. at 334-35. Such evidence is lacking in this case.

prosecutors' office in Miller-El I is absent from this case. Blanton's argument for discrimination in the jury shuffle would have to arise from a disputed and vague statement allegedly made by the prosecutor, the concentration of black venire members at the front of the original panel, and the alleged pretext of the prosecutor's occupation-based reason; these elements do not rise to the level of intentional discrimination present in Miller-El I.

The state habeas court accepted the prosecutor's race-neutral justification for the strike. This decision involved, at least in part, a credibility determination made by the state habeas court. See Goodwin, 224 F.3d at 457. In overruling Blanton's Batson objection to venire member Johnson in the first instance, the state trial court reached a positive finding regarding the credibility of the prosecutor's race-neutral reasons for striking Johnson. See Miller-El I, 537 U.S. at 340 ("[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."). As explained above, our review of the jury venire records do not present the clear and convincing evidence necessary to overturn the state habeas court's acceptance of this testimony. See 28 U.S.C. § 2254(e)(1). We also believe that the race-neutral justifications for striking venire member Johnson find support in the record. Finally, we know that the CCA's appellate review of Batson claims is limited to clear error. We recognize that the jury shuffle argument presented by Blanton at state habeas may have improved his chances of prevailing on direct appeal. However, merely improving his chances does not rise to the level required to show prejudice)) Blanton must show that had counsel acted differently, his case would have been reversed. See Strickland, 466 U.S. at 694 (finding that "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). This he has not done.

Based on the factual and credibility findings made at the state trial and

25

habeas proceedings, and the CCA's limited review of Batson claims on appeal, we find that the state habeas court reasonably concluded that Blanton suffered no prejudice as a result of his appellate counsel's failure to argue the jury shuffle component to his Batson claim, and accordingly agree with the district court's denial of habeas as to this issue.

IV

For the foregoing reasons, we AFFIRM the district court's denial of habeas corpus relief.