REVISED October 27, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2009

Charles R. Fulbruge III
Clerk

No. 08-70024

COY WAYNE WESBROOK

                                              Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

                                              Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas, Houston

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Coy Wayne Wesbrook was convicted of capital murder and sentenced to death for murdering Gloria Coons and Antonio Cruz in the same criminal episode. We granted a certificate of appealability ("COA") authorizing him to appeal the district court's denial of federal habeas relief. We now AFFIRM the district court's denial of federal habeas relief for the reasons that follow.

I.

Wesbrook was convicted of capital murder and sentenced to death in Harris County, Texas, in June 1998 for murdering Gloria Coons (his second wife) and Antonio Cruz in the same criminal event. At trial, the State presented evidence that Wesbrook, in addition to murdering Coons and Cruz, also, on the same occasion, murdered Ruth Money, Anthony Rogers, and Kelly Hazlip.

Wesbrook was the only surviving witness to the shootings. He testified at trial that he and Gloria Coons were married in 1995. They divorced in 1996, but continued to see each other and began living together again at some point. In August 1997, he moved out of the apartment they had shared. Around that time, in an unrelated but stressful event, he discovered that his nine-year-old daughter (by his first wife) had been sexually abused by his first wife's boyfriend.

At trial, Wesbrook testified in his own defense that he had lunch with Gloria Coons on November 12, 1997, and that she indicated that she was interested in reconciliation. He went to her apartment that evening, hoping that she would be alone. Instead, the other victims were present. Wesbrook testified that he began to feel humiliated when Gloria flashed her breasts to the group present at the apartment. She had sex with one of the victims and said that she was going to have sex with another of the victims, so he decided to leave. Antonio Cruz followed him out of the apartment and took the keys to his truck. Wesbrook said that he grabbed his hunting rifle from his truck and followed Cruz back into the apartment to get his keys. He claimed that, once he was back inside the apartment, the others verbally harassed, threatened, and physically abused him. He said that when someone threw a beer at him, the rifle "went off." After shooting all five of the victims, he went outside, announced that he had committed the offense, and then waited for the police to arrive. He told the jury that he just "lost it" and that he had no intention of killing anyone.

Wesbrook's father also testified. He told the jury that Wesbrook had learning difficulties in school, that he was evaluated by a psychologist when he was around ten years old, and that he dropped out of school in the eighth grade, on the advice of the principal.

The jury convicted Wesbrook of capital murder.

At the punishment phase of Wesbrook's trial, the State presented evidence that Wesbrook had cut Gloria Coons's telephone line, threatened to burn the home of his first wife, Brenda Williams, attempted to burn the home of his ex-landlords after they evicted him, and threatened Coons and her friends with a gun. Phillip Jones, one of Wesbrook's fellow inmates, testified that, while in jail awaiting trial for capital murder, Wesbrook repeatedly talked about wanting to have his ex-wife, Brenda Williams, and her husband killed. According to Jones, Wesbrook planned to give his two cousins his truck in exchange for their killing Williams and her husband. In addition, the State presented evidence, including testimony and tape-recorded conversations, that Wesbrook was soliciting the murders of three other people.[1]

Also at the punishment phase, the defense presented evidence, including Wesbrook's school records and some medical records. On cross-examination of the State's witness, Jones, the defense brought out the fact that Wesbrook appeared genuinely to show remorse for the murders he had committed. Several of Wesbrook's former co-workers and supervisors testified that Wesbrook was a dependable and reliable worker as a security guard and dispatcher for the

---

[1] The opinion of the Texas Court of Criminal Appeals on direct appeal states that, in addition to his first wife and her husband, Wesbrook wanted five additional individuals murdered, four of whom were witnesses who had testified or were going to testify against him at trial, and the fifth a fellow inmate at the Harris County Jail. The record reflects, however, that the list of persons Wesbrook wanted to have killed included only five persons: his ex-wife and her common-law husband, a witness who testified for the State at the guilt-innocence phase of his trial (Bradley Smith) and his wife (Wendy), and another woman who was on the State's subpoena list (Angela Pinnell), who lived in the same apartment complex where the murders of Coons and the other victims took place.

volunteer fire department. The defense also presented evidence that Wesbrook had a close relationship with his young daughter, that his first wife's new husband had molested that daughter, and that he was depressed around the time of the shooting. Matthew James Nail, one of Wesbrook's fellow inmates in the Harris County Jail, testified that he and other inmates were concerned about what Jones might be doing to Wesbrook, because Wesbrook seemed weak and vulnerable. Nail testified that he never heard Wesbrook say anything about a plan to kill witnesses. Wesbrook's sister testified that he was slow as a child and that he dropped out of school after the eighth grade. A psychologist, whose testimony is described in detail infra, also testified for the defense that Wesbrook had a major depressive disorder, with an underlying dependent personality disorder, and that he had poor coping skills. She testified that he was "very much at the end of his rope" at the time of the murders.

The jury answered the special punishment issue on future dangerousness affirmatively and answered the special issue on mitigation negatively. On the jury findings, the court imposed the death penalty.

Wesbrook's conviction and sentence were affirmed on direct appeal. Wesbrook v. State, 29 S.W.3d 103 (Tex. Crim. App. 2000). The Supreme Court denied certiorari. Wesbrook v. Texas, 532 U.S. 944 (2001). The Texas Court of Criminal Appeals denied Wesbrook's first state habeas application in June 2002. Ex parte Wesbrook, No. 52,120-01 (Tex. Crim. App. June 26, 2002).

Wesbrook filed his federal habeas petition in December 2002. In June 2003, he filed a successive state habeas application in which he claimed that he is mentally retarded and exempt from execution. The district court dismissed his federal petition without prejudice so that Wesbrook could seek relief on his mental retardation claim in state court. The Texas Court of Criminal Appeals denied Wesbrook's successive state habeas application in March 2007. Ex parte Wesbrook, No. WR-52,120-02 (Tex. Crim. App. March 21, 2007).

4

On June 29, 2007, Wesbrook filed an amended petition for federal habeas relief, asserting nine claims for relief. The district court granted summary judgment for the state and denied relief and a COA.

Wesbrook requested a COA from this court to appeal the denial of relief as to three claims. Based on our "threshold inquiry," consisting of "an overview of the claims in the habeas petition and a general assessment of their merits," Miller-El v. Cockrell, 537 U.S. 322, 327, 336 (2003), we granted a COA for Wesbrook's claims that (1) his trial counsel rendered ineffective assistance by failing to investigate fully his neurological impairments; (2) he was denied his Sixth Amendment right to counsel by the State's use of an undercover informant to obtain incriminating statements while he was incarcerated and represented by counsel; and (3) his due process rights were violated because the trial judge engaged in ex parte communications with the prosecution and acted in a dual role as both an investigator and an adjudicator. Wesbrook v. Quarterman, 318 F. App'x 265 (5th Cir. Feb. 17, 2009) (unpublished).

The parties were given the opportunity to submit supplemental briefs on the merits of the claims, but did not submit supplemental briefs. Having considered the briefs and based on our review of the record of the state court trial, and the state and federal habeas proceedings, we conclude that the state court's decision to deny relief on these claims is not based on an unreasonable determination of the facts in the light of the evidence presented, and is neither contrary to, nor an unreasonable application of, clearly established federal law. We therefore AFFIRM the district court's denial of federal habeas relief.

## II.

Wesbrook is not entitled to federal habeas relief on his claims unless the state court's adjudication of the claims

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). An "unreasonable application" of clearly established federal law occurs "if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The state court's factual determinations "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"In reviewing the district court's application of § 2254(d) to the state court decision, we review the district court's findings of fact for clear error and its conclusions of law de novo." Blanton v. Quarterman, 543 F.3d 230, 235 (5th Cir. 2008).

We now turn to address each of Wesbrook's claims, beginning with his ineffective assistance claim.

A.

Wesbrook contends that his trial counsel rendered ineffective assistance by failing to investigate fully his neurological impairments. To establish a Sixth Amendment violation, Wesbrook must prove that his counsel rendered deficient performance and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel's performance was deficient if it "fell below an objective standard of reasonableness." Id. at 688.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91. "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." Wiggins v. Smith, 539 U.S. 510, 523 (2003) (internal quotation marks and citations omitted). There is a "strong presumption" that counsel's conduct "falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and we may "not find ineffective assistance of counsel merely because we disagree with counsel's trial strategy." Crane v. Johnson, 178 F.3d 309, 312 (5th Cir. 1999). "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins, 539 U.S. at 533.

To receive federal habeas relief on his ineffective assistance claim, Wesbrook must establish that the decision of the Texas Court of Criminal Appeals is either contrary to, or an unreasonable application of, Strickland. See Blanton, 543 F.3d at 235. We now turn to the relevant facts of this case.

At the punishment phase of trial, Dr. Ann Wheeler, a psychologist, testified for the defense. Dr. Wheeler reviewed records of tests conducted on Wesbrook by Dr. Kennett, a psychologist, when Wesbrook was ten years old. According to Dr. Wheeler, those tests indicated that Wesbrook had average to low-average intelligence and suffered from a learning disability, for which he was punished by the school that he attended. She testified further that Dr. Kennett's testing showed that Wesbrook suffered from a neurological impairment that caused significant problems with his academic development and hampered his psychological and social development because it made it difficult for him to make friends and caused him to be inept in social interaction. She noted that Dr. Kennett had recommended further neurological follow-up, including an EEG and a full neurological examination by a neurologist. Furthermore, Dr. Kennett found that Wesbrook had a mixed dominance (left-handed, right-footed, and left-eyed), which is very unusual and indicates a need for further testing to see whether there are neurological problems that caused the condition. According to Dr. Wheeler, Wesbrook would have been labeled as learning disabled in today's terms.

Based on limited testing that she conducted on Wesbrook, Dr. Wheeler estimated that his IQ is about 90. She testified that the evidence indicated to her that prior to the murder, Wesbrook abused alcohol and was clinically depressed, and that the combination of the depression and alcohol abuse left Wesbrook with very poor coping skills. She said that he also suffered from a dependent personality disorder; as a result, he was never fully independent and sought out relationships with women who would assume responsibility for him. She said that the fact that Wesbrook's daughter had been molested, as well as several other significant stressors, likely resulted in a rapid deterioration of his functioning around the time of the murders. She also testified that Wesbrook's

relations with Gloria Coons were very volatile and that, on the night of the murders, Wesbrook was at the end of his rope.

Wesbrook argues that his trial counsel were on notice from two sources – the early school reports and testing, and Dr. Wheeler – that he had possible brain damage, but counsel failed to conduct a proper investigation and failed to pursue neurological testing that would have produced significant mitigating evidence. Instead, he maintains, his counsel chose to present a flimsy self-defense case, based almost solely on the fact that one of the victims took Wesbrook's truck keys and would not return them to him. Wesbrook complains that Dr. Wheeler did not test his IQ and did not conduct the neurological tests recommended by Dr. Kennett in his 1968 report. He also contends that counsel's lack of preparation for Dr. Wheeler's testimony resulted in a failure to bring the fact of his severe neurological deficits before the jury, and allowed the prosecution, on cross-examination, to twist her testimony to portray Wesbrook as a sociopath and a future danger, rather than a borderline mentally retarded man with no criminal history. He argues that, had trial counsel done a proper investigation and followed up on the recommendation for neurological testing, he would have been able to provide the jury with an explanation for his bizarre behavior – that his actions on the night of the murders were attributable to neurological impairment.

The state habeas court concluded that

> Counsel was not ineffective for making the reasonable trial decision to refrain from seeking additional psychological evaluations of the applicant, particularly in light of the two psychological evaluations already completed. The evaluations performed by the two mental health professionals indicated that any additional investigation would not have assisted in the applicant's defense.

Wesbrook maintains that if counsel had conducted a proper investigation, they would have discovered evidence such as that he presented in connection with his second state habeas application (in which he claimed to be mentally retarded). In those successive habeas proceedings, Wesbrook obtained an expert report from a psychologist, Dr. Stephen K. Martin. Dr. Martin's report is attached as an exhibit to Wesbrook's federal habeas petition. In his report, Dr. Martin stated that Wesbrook has damage to the frontal lobes of his brain and that this frontal lobe damage, along with Wesbrook's low intelligence, made it more difficult for Wesbrook to moderate his reactions to emotionally charged situations. Dr. Martin also stated that frontal lobe impairment has been associated with anger control issues, and that persons who have frontal lobe damage are at greater risk to engage in impulsive and potentially violent behaviors without fully considering the consequences. He expressed his opinion that this clinical information, had it been presented at trial, would have been helpful to the jury in understanding how Wesbrook could have engaged in the violent act of murdering five people.

We agree with the district court's observation that Dr. Martin's affidavit, upon which Wesbrook relies as support for his claim, is "largely duplicative" of Dr. Wheeler's trial testimony, with the notable exception of Dr. Martin's discussion of Wesbrook's frontal lobe damage. Because the jury had before it, through Dr. Wheeler's testimony, evidence of Wesbrook's impairments, there is not a reasonable probability that the outcome of the punishment phase would have been different if the jury had been presented with evidence that Wesbrook had "frontal lobe" damage. The state court's determination that Wesbrook's counsel did not render ineffective assistance by failing to secure additional expert testimony regarding those impairments is not an objectively unreasonable application of Strickland. Accordingly, the district court did not err in denying federal habeas relief on Wesbrook's ineffective assistance of counsel claim.

B.

We now turn to consider Wesbrook's claim that he was denied his Sixth Amendment right to counsel by the State's use of an undercover informant to obtain incriminating statements while he was incarcerated and represented by counsel.

"The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." Maine v. Moulton, 474 U.S. 159, 176 (1985) (holding that state's use of informant to obtain incriminating evidence from defendant about pending charges violated defendant's Sixth Amendment right to counsel, notwithstanding that state was also investigating other charges as to which the Sixth Amendment right to counsel had not attached). "[I]ncriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." Id. at 180. However, evidence pertaining to charges as to which the Sixth Amendment right to counsel has not attached at the time such evidence was obtained, is admissible. Id. at 180 n.16.

Phillip Jones met Wesbrook approximately three months before Wesbrook's trial began, while both of them were incarcerated in the Harris County Jail. They had a number of conversations in which Wesbrook spoke of his desire to have his ex-wife and her husband killed. After Wesbrook was moved to the county jail's medical facility in May 1998, Jones contacted the police and offered to serve as an informant. The police and the District Attorney's Office agreed to put Jones back in contact with Wesbrook. The plan was for Jones to arrange a meeting between Wesbrook and an undercover law enforcement officer, Gary Johnson, who was posing as a "hit" man.

Jones was placed in Wesbrook's cell block on June 11, 1998. By that time, Wesbrook's trial had started. Wesbrook told Jones he wanted three more people added to the list of persons he wanted to have killed. Wesbrook gave Jones a list of the names of those he wanted killed and the type of car each person drove. Jones arranged to have Johnson speak to Wesbrook on the telephone, and Wesbrook told Johnson what he wanted. The next day, Wesbrook was placed in contact with Johnson again and he told Johnson he wanted to call off the plan because he was afraid the call was being taped by jailers. Wesbrook's conversations with Johnson were recorded.

Immediately prior to the punishment phase of trial, Wesbrook moved to suppress the evidence obtained by Jones. The trial court conducted a hearing on the motion. At the hearing, Harris County Detective Harry Fikaris testified that Jones was working for the State as an informant to obtain evidence for a solicitation of murder case. He admitted, however, that the information and evidence obtained would also be used against Wesbrook at the punishment phase of his capital murder trial. At the conclusion of the hearing, the trial judge denied Wesbrook's motion to suppress and allowed the State to introduce Jones's testimony and audiotaped recordings of the telephone conversations between Jones and Johnson at the punishment phase.

On direct appeal, the Texas Court of Criminal Appeals held that the evidence obtained by Jones, while he was acting as an informant for the State, was inadmissible as evidence of Wesbrook's future dangerousness in his capital murder trial, because it was obtained in violation of Wesbrook's Sixth Amendment right to counsel. 29 S.W.3d at 118-19. A majority of the court concluded, however, that the error was harmless beyond a reasonable doubt:

> To support a finding of future dangerousness . . ., prosecutors relied on the facts of the crime itself, the unadjudicated extraneous solicitation offense, and several bad acts committed by appellant. Aside from

evidence of a horrific killing spree that left five people dead, jurors heard from Phillip Jones, who, before he became an agent for law enforcement, independently discovered appellant's efforts to solicit the murders of two individuals. Jones' testimony about these particular facts was free from any Sixth Amendment concerns. The jury, at that point, validly possessed a critical indicator of future dangerousness: that appellant, despite his incarceration for a brutal multiple homicide, was willing to arrange and condone further murders, this time by proxy. Any additional, inadmissible testimony of appellant's hopes to expand his list of desired targets was of minimal consequence. In other words, because the jury possessed details of both the crime itself and the solicitation to murder, there is no reasonable likelihood that the inadmissible portion of Jones' testimony, considered either alone or in context, moved the jury from a state of nonpersuasion to persuasion regarding the issue of future dangerousness.

29 S.W.3d at 119-20. Four judges dissented.

The district court held that, in the light of the horrific nature of Wesbrook's crime, the evidence of his longstanding habit of threatening others with violence, and the untainted evidence of his plot to solicit two other murders, Wesbrook had failed to demonstrate that the tainted evidence had a substantial and injurious effect or influence on the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

Wesbrook argues that the admission of the evidence was not harmless because, aside from Jones's testimony and the damaging tape recording, the rest of the testimony at the punishment phase consisted of allegations that he had cut his ex-wife's telephone wire and allegedly made some threats, none of which were carried out. Wesbrook argues further that the state court failed to identify correctly the appropriate governing legal principle because it applied a sufficiency of the evidence test. He contends that the prosecution's use of and

reference to the illegally obtained tape recordings in its final argument, and the fact that this evidence substantially bolstered the credibility of an otherwise incredible jailhouse snitch, had a substantial or injurious effect on the jury's determination of the future dangerousness issue.

The State points out that, although both of the prosecutors discussed the illegally-obtained evidence in their closing arguments, they also discussed at length the facts of the crime and the impact of the murders on the victims' families, the violent threats Wesbrook made against others, Wesbrook's mitigating evidence, and his lack of remorse.

Wesbrook is entitled to federal habeas relief on this claim "only if the [Texas Court of Criminal Appeals] applied harmless-error review in an 'objectively unreasonable' manner." Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (citations omitted). "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht [v. Abrahamson, 507 U.S. 619 (1993)]." Fry v. Pliler, 551 U.S. 112, 121 (2007). In Fry, the Supreme Court stated:

> Given our frequent recognition that [the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")] limited rather than expanded the availability of habeas relief, it is implausible that, without saying so, AEDPA replaced the Brecht standard of actual prejudice with the more liberal AEDPA/Chapman standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable. That said, it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former.

Id. at 119-20 (internal quotation marks and citations omitted). Accordingly, in assessing the reasonableness of the state court's application of harmless error review, we must resolve whether the violation of Wesbrook's Sixth Amendment

14

right to counsel had a substantial and injurious effect on the verdict at the punishment phase. We conclude that it did not, and that the state court's application of harmless error review is neither contrary to, nor an unreasonable application of, clearly established federal law. The evidence of Wesbrook's attempts to solicit the murders of his ex-wife and her husband was uncovered prior to Jones becoming an agent for the State. In the light of the evidence that Wesbrook murdered five people, and the untainted evidence that he attempted to solicit the murders of his ex-wife and her husband, the erroneous admission of evidence that Wesbrook attempted to solicit the murders of three more individuals did not have a substantial or injurious influence on the jury's determination of the future dangerousness issue. Accordingly, the district court did not err by denying federal habeas relief for this claim.

C.

We now consider Wesbrook's final claim: that his due process rights were violated because the trial judge engaged in ex parte communications with the prosecution and acted in a dual role as both an investigator and an adjudicator.

A basic requirement of the Due Process Clause of the Fourteenth Amendment is "[a] fair trial in a fair tribunal." In re Murchison, 349 U.S. 133, 136 (1955). Recusal is required when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. 35, 47 (1975). Due process is violated when a judge has a dual role of both investigating and adjudicating a matter. See Murchison, 349 U.S. at 139 (holding that it violated due process for one adjudicator to act as grand jury and judge for same defendants).

On June 12, 1998, in a pretrial hearing, defense counsel asked the trial court to order the State to reveal any agreements it had made with any witnesses in exchange for their testimony. The prosecutors requested an ex parte meeting with the trial judge. During the ex parte meeting, which was

15

transcribed by the court reporter, the prosecutors expressed concern about complying with the defense's request for disclosure because of an ongoing investigation. The prosecutors explained that they had recently received information from a fellow inmate (Jones) that Wesbrook had talked to Jones about soliciting the murder of his former wife, Brenda Williams. The prosecutors told the court that the only agreement they had made with the inmate, at that point, was to tell the prosecutors on his case about his assistance. The prosecutors said that they could not, at that time, disclose this information to the defense because the investigation was still ongoing.

The trial judge stated that she did not want to interfere with an ongoing investigation, and would not want to endanger the inmate, but that she was concerned because the inmate was working as an agent of law enforcement and that is a "very sticky area of the law." She urged the prosecutors to be very careful ethically and warned them that they had only a few days to make a decision whether they were going to use any evidence developed as a result of the investigation. She stated further that if the prosecutors were going to go into the matter at trial, the defense would need some time to prepare and respond. The court expressed the concern that "we have to make sure the defense knows about that from a due process standpoint." The judge decided to tell defense counsel that no deal existed at that time, but that one was possible and would be revealed if reached.

At the conclusion of the meeting, Wesbrook's counsel objected to the ex parte meeting and asked the trial court to disclose the content of the communications and provide a transcript from the court reporter. The trial court denied the request, but told Wesbrook that the prosecutors "informed me that they have no agreements, they have informed me that there is some small possibility some agreement might be coming in the future, and as soon as they know that, they will notify the Court, and the defense, of course, would be

informed." Wesbrook's counsel expressed concern about whether they would be given sufficient time to prepare for the cross-examination of that witness, and the trial court assured them that a continuance would be granted to give defense counsel enough time to respond to the State's evidence. Wesbrook requested that, even if a deal were not made with the witness, his identity be revealed so that he could be cross-examined about his attempt to seek a benefit from the State. The State agreed.

Later during the same pre-trial hearing, the court inquired about the defense motion to disclose the existence of any questioning, surveillance, or observations of Wesbrook by State agents or representatives. The prosecutors stated that they had tendered to the defense everything they had at that point. The court asked to see the prosecutors and the court reporter in chambers, over the defense's objection.

At this second ex parte meeting, the trial judge stated that any surveillance of Wesbrook by the State would fall within the scope of the defense's discovery motion and would have to be disclosed. The prosecutors responded that nothing had happened yet and thus there was nothing to disclose. They told the court that they did not know, at that point, whether Wesbrook would be recorded during the investigation. The judge told the prosecutors that "as soon as you do it, you have to inform them." She urged the prosecutors to check on the constitutional issues very carefully so there was nothing improper. Ultimately, the trial judge interpreted Wesbrook's motion as asking for "tests, questioning, surveillance, or observations" that had already been done.

After the second ex parte meeting, the court sought clarification from defense counsel about the disclosure requested. Wesbrook's counsel indicated that he sought access to information "regarding any jailers or anybody that conducted any kind of special surveillance of him or if there were any individuals that were inmates there that became agents of the State to specifically entice

17

Wesbrook into conversations so that those individuals would now be coming in and testifying on behalf of the State." The trial court granted the motion and instructed the prosecutors that, should any of those things come up during the trial, they would need to inform defense counsel immediately.

Five days later, the State disclosed to Wesbrook the evidence it had obtained in its investigation into his solicitation for the murder of his ex-wife. The State provided the defense with a copy of tape-recorded telephone conversations in which Wesbrook was soliciting the murder of his ex-wife and her husband, as well as three other persons. The State also gave Wesbrook a copy of a piece of paper on which Wesbrook had written the names and addresses of the people he wanted killed, and copies of the agreement with the informant, the informant's criminal record, and an updated subpoena list.

The next day, Wesbrook's counsel filed a motion to recuse the trial judge, alleging that information received by the judge during the two ex parte meetings with the prosecutors may have improperly influenced the judge and tainted the judge's ability to be fair and impartial. A visiting judge heard evidence on the recusal motion. The trial judge testified that she had made it clear to the prosecutors in the ex parte meetings that she was very concerned about Wesbrook's due process rights and that the prosecutors would have to inform defense counsel about the investigation as quickly as possible. The court reporter's transcripts of the two ex parte meetings were unsealed and made a part of the record of the hearing. The visiting judge found no grounds for recusal and denied Wesbrook's motion.

On direct appeal, Wesbrook argued that the trial judge's ex parte communications with the prosecutors violated the Code of Judicial Conduct and that, by exposing herself to the potentially incriminating information, the judge's impartiality was compromised. He contended that the trial judge should have recused herself because she was to rule on the admissibility of the evidence she

permitted the State to generate, and this violated his Fourteenth Amendment right to due process. 29 S.W.3d at 120. The Court of Criminal Appeals rejected the claim, stating:

> Even assuming arguendo that a violation of the Code of Judicial Conduct did occur, and also assuming arguendo that it is possible such a violation has the potential to rise to the level of reversible error, appellant has failed in this case to demonstrate sufficient harm resulting from this alleged violation to the degree a reversal would be warranted. It is true that while sufficient bias can result in disqualification, it does so only in those cases in which the bias is shown to be of such a nature and to such an extent as to deny a defendant due process of law. . . . The defendant failed to demonstrate at the hearing, as was his burden, that [the trial judge] possessed any bias, much less sufficient bias that would have interfered with appellant's rights to due process. It is within the zone of reasonable disagreement that the presumption of judicial impartiality was not overcome by appellant.

29 S.W.3d at 121 (citations omitted).

In his state habeas application, Wesbrook claimed that he was deprived of his right to an impartial and disinterested tribunal because the trial court had effectively become a member of the prosecution team. The state habeas court concluded that the claim need not be considered because it had been raised and rejected on direct appeal. Alternatively, the state habeas court concluded that Wesbrook had failed to establish that a reasonable person, knowing all the circumstances involved, would harbor doubts about the impartiality of the trial judge to the extent that Wesbrook was denied due process.

Wesbrook argues that the trial judge acted in a dual role of investigator and adjudicator and that bias should therefore be presumed. Wesbrook maintains that, to the extent that the state court focused on harm, its decision was contrary to clearly established federal law because, in cases of presumed or

actual bias, harm or prejudice is not relevant. He contends, therefore, that the state court failed to identify correctly the appropriate governing legal principle and its decision was contrary to or an unreasonable application of clearly established federal law when it focused on whether Wesbrook had established that the trial judge was, in fact, biased. Wesbrook contends that the trial judge's dual role is established by the fact that she sat silently while she allowed the prosecution to lie to the defense that there was no deal with the informant, and later when the prosecution again lied when it stated that it had nothing to disclose about jailhouse informants. Wesbrook asserts that, by lending the stature of her office to these misrepresentations, the trial judge was advancing the cause of the prosecution and, in effect, assisting the prosecution in the investigation and presentation of its case.

We agree with the district court that the record does not support Wesbrook's contention that the trial judge acted in a dual role as both investigator and adjudicator. As we have noted, the ex parte meetings were transcribed by the court reporter. As the district court held, the record reflects that the trial judge remained neutral and made determined efforts to both protect Wesbrook's due process right to obtain material information and, at the same time, avoid unnecessary interference with the State's ongoing investigation into Wesbrook's solicitation of other murders. There is nothing in the record to indicate that the trial judge improperly placed herself in the role as part of the prosecution or in the investigation of Wesbrook's solicitation of murder. During the meetings, the trial judge repeatedly expressed her awareness of Wesbrook's due process rights. She expressed her concern for the rights of Wesbrook by warning the prosecutors several times about the ethical and legal issues involved in pursuing the solicitation investigation.

The state court's rejection of Wesbrook's due process claim is not contrary to or an unreasonable application of clearly established federal law. Because the

record does not support Wesbrook's argument that the trial judge acted in a dual role as both investigator and adjudicator, there is no basis for a presumption of bias.  The district court did not err by denying Wesbrook's due process claim.

III.

For the foregoing reasons, we AFFIRM the judgment of the district court denying Wesbrook's petition for federal habeas relief.

AFFIRMED.