# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 09-70021

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**
August 18, 2010

Lyle W. Cayce
Clerk

RODNEY GRAY,

Petitioner-Appellant

v.

CHRISTOPER B EPPS, COMMISSIONER,
MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before JOLLY, BENAVIDES, and HAYNES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Petitioner Rodney Gray ("Gray"), convicted of capital murder in Mississippi and sentenced to death, appeals the district court's denial of federal habeas relief. Gray contends that his counsel rendered ineffective assistance by failing to investigate and present mitigating evidence during the sentencing phase of trial. Concluding that the state court's adjudication of Gray's claims was not an unreasonable application of clearly established Federal law, we AFFIRM.

No. 09-70021

I.    BACKGROUND

A.    Factual History

On August 15, 1994, in Newton County, Mississippi, Grace Blackwell, the 79-year old murder victim, drove to her local bank and proceeded to the drive-through window.  Arlene McCree was working as a bank teller, and Blackwell had been her customer since 1980.  McCree thought Blackwell looked "terrible."  Usually, McCree and Blackwell would engage in small talk; however, on this occasion, Blackwell would not look at or converse with McCree.  Instead, Blackwell simply stated "I need twelve hundred dollars."  McCree had to prompt Blackwell by asking her whether she wanted to cash a check or use a withdrawal slip.  In response, Blackwell threw a blank check into the window tray.  McCree could not see the backseat of the car because there were clothes "hanging in a very unusual manner."  Concerned by Blackwell's behavior, McCree asked Blackwell whether "something [was] wrong or . . . someone [was] in the car with her."  Blackwell did not respond to the questions;  instead, she attempted to mouth words to McCree, who could not read Blackwell's lips.  After McCree made out the check for $1200, Blackwell signed it.  Although McCree attempted to stall the transaction, she subsequently placed the money in the window tray, and Blackwell grabbed it.  Blackwell then drove away saying "I'm hurrying, I'm hurrying."  McCree did not think that Blackwell was speaking to her.  Believing Blackwell had been taken hostage, McCree called the Sheriff's Office.

A deputy sheriff was dispatched to Blackwell's home and found the front door open.  Blackwell's car was not there and the "telephone wires [were] disconnected."  Meanwhile, Harry Jones was driving his car on Pine Bluff Road in Newton County and saw a brown Chrysler, which he later identified at trial as Blackwell's car, stopped in the road. He saw a man "wrestling with this lady."  Although he could not identify the woman, he identified Gray as the driver of Blackwell's car.

2

No. 09-70021

Later that same day, Lane McDill was driving to town on Newly Road[1] in Newton County and observed something lying "just off the bridge on the right-hand side of the road." McDill stopped his vehicle and quickly discovered it was a deceased woman. He then drove to town and notified the police that there was a body at the bridge. As a result, law enforcement officers arrived at the scene, and the ensuing investigation revealed that Blackwell had been killed by a shotgun wound to the face. A forensic pathologist determined that Blackwell suffered a "series of injuries," "including the presence of two shotgun wounds, as well as multiple scrapes of the skin, called abrasions, and lacerations, a cut, and contusions." The lethal shotgun wound was a "contact shotgun wound with the muzzle of the shotgun placed against the area of the mouth." The second shotgun wound "is consistent with having gone through an intermediate target scattering and striking the decedent over the left arm, left chest, and left cheek." Blackwell's other injuries were consistent with either being struck by or pushed out of a vehicle. The forensic investigation also revealed that Blackwell had been raped and that the DNA analysis indicated that Gray was the perpetrator.[2]

Additionally, the Newton County Sheriff's Office interviewed Mildred Curry, who was Gray's girlfriend at the time. Curry told them that Gray had called from jail and informed her that there was money in her bathroom vent. A deputy sheriff searched her residence and found $1,123 in the bathroom vent. The search also uncovered the clothes and boots that Gray was wearing on the day of the murder.

---

[1] Newly Road was formerly known as "Everett Store Road."

[2] The "significance of [the] match is that there is a probability that selecting someone other than . . . someone unrelated to [Gray] in the population, having the same profiles as that sample, would be less than 1 in 446,000,000 in Black, Caucasian, and Hispanic populations."

No. 09-70021

B.    Procedural History

In 1995, a Newton County, Mississippi grand jury returned an indictment that charged Gray with committing intentional murder while engaged in the commission of the crime of kidnapping and/or rape in violation of Miss. Code Ann. § 97-3-19(2)(e).  A jury convicted Gray as charged.  After a sentencing hearing, the jury unanimously found, among other things, that there were "insufficient mitigating circumstances to outweigh the aggravating circumstances" and that the "Defendant should suffer death."  The trial court sentenced Gray to death by lethal injection.

On direct appeal, the Mississippi Supreme Court affirmed Gray's conviction and sentence. *Gray v. State*, 728 So.2d 36 (Miss. 1998).  Gray applied for state post-conviction relief, which the Mississippi Supreme Court ultimately denied in a published opinion. *Gray v. State*, 887 So.2d 158 (Miss. 2004).  Gray subsequently filed a federal petition for writ of habeas corpus, which the district court denied in a memorandum opinion and order.  The district court granted Gray a Certificate of Appealability (COA) with respect to the issue he now raises on appeal.[3]

II.    STANDARD OF REVIEW

Gray filed his 28 U.S.C. § 2254 petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA).  The petition, therefore, is subject to AEDPA. *See Lindh v. Murphy*, 521 U.S.

---

[3] Pursuant to Fed. R. App. P. 31(a), Gray's initial brief was due on December 9, 2009. Counsel obtained an extension of time until January 8, 2010.  Counsel requested another extension of time, which was denied as moot when his brief was ultimately filed on January 11.  On March 11, 2010, counsel submitted a motion for COA on additional issues as to which the district court denied a COA. The Clerk responded with a letter, advising that no action was being taken on the motion because it was filed out of time.  Counsel has not asked us to revisit the Clerk's notice that no action would be taken.   Even if the COA motion were considered timely filed, it fails to make a substantial showing of the denial of a constitutional right as to those issues. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, it is denied.

320, 336 (1997). Pursuant to the federal habeas statute, as amended by AEDPA, we defer to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 404–08 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is "objectively unreasonable." *Id*. at 409. Further, pursuant to section 2254(e)(1), state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001).

## III.    INEFFECTIVE ASSISTANCE CLAIM

Gray argues that his Sixth Amendment right to effective assistance of counsel was violated during the sentencing phase of his trial. He contends that his trial counsel failed to adequately investigate and present mitigating evidence with respect to his family history and educational and mental health background at sentencing. More specifically, the district court granted a COA as to the claim of ineffective assistance based on counsel's failure to request their own court-appointed psychiatrist to offer mitigating evidence and counsel's failure to present the following:

> (a) evidence of the poverty of Gray's family during his childhood; (b) evidence of the lack of support for Gray in his childhood, leading to

low grades and other problems; (c) evidence of the psychological factors and condition suffered by Gray at the time of the alleged offense; (d) evidence of Gray's dull normal intelligence, and (e) adequate character testimony when family members, friends and neighbors were available to do so, when witnesses were available and willing to offer helpful testimony.

To establish ineffective assistance of counsel, Gray must show (1) defense counsel's performance was deficient and (2) this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We must find that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case. *Id*. at 688. While "[j]udicial scrutiny of counsel's performance must be highly deferential," Gray can demonstrate deficient performance if he shows "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. However, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689). *Strickland*'s "prejudice" prong requires a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of his capital murder trial would have been different. *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

### A.    Performance Prong

As previously set forth, Gray contends that trial counsel rendered ineffective assistance by failing to investigate and present substantial mitigating evidence during the sentencing phase of his trial. In determining whether trial counsel's performance was deficient, our "focus [is] on whether the

investigation supporting counsel's decision not to introduce [additional] mitigating evidence of [a petitioner's] background *was itself reasonable.*" *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003).

Thus, we must consider the reasonableness of trial counsel's investigation. The record reveals that, prior to trial, Gray's counsel filed a motion for a psychiatric examination of Gray. In the motion, counsel averred that they had reason to believe that Gray was suffering from "some mental disease, injury or congenital deficiency which could render [him] incapable of preparing a defense and standing trial." Counsel further averred that they had reason to believe that Gray might be "incapable of intelligently participating in the process of this cause." The trial court granted the motion, appointing Dr. Charlton Stanley, Ph.D, a forensic psychologist, and Dr. Donald Guild, M.D., a psychiatrist, to examine Gray "to determine his present ability to stand trial and assist his attorneys in his defense; and further examine him to determine his ability to know the difference between right and wrong and to understand the nature and quality of his actions at the time of the alleged offense."

After Gray was examined, Dr. Stanley issued a 9-page report, summarizing the test results and conclusions. This report will be more fully set forth in Section III. B., *infra*; however, the following is a summation of the report. The report provided that Gray had a full scale IQ score of 80, which is classified as low dull normal. Dr. Stanley found that Gray was very cooperative during the testing. Gray was found to be an "antisocial type," with an "undeveloped or underdeveloped conscience." Gray is depressed, has "very poor impulse control and has had some suicidal ideation." Gray appears to have Attention Deficit Disorder and mild dyslexia. Gray's neuropsychological test result has a "pattern often associated with some residual artifacts from drug use, although the attention deficit and dyslexia present a similar picture." Dr. Stanley concluded Gray did not appear to have any "significant 'brain damage'

of a type usually referred to as Organic Brain Syndrome." Gray was found to be competent to assist his lawyer in preparing a defense. Gray did not meet the test for insanity under the M'Naghten Rule. This report was furnished to defense counsel, the prosecutor, and the trial court.

Gray contends that this report should have spurred his counsel to conduct further investigation. Gray further contends that his defense counsel's investigation is very similar to an investigation that the Supreme Court found to constitute ineffective assistance. *See Wiggins*, 539 U.S. at 523–34. As in the instant case, defense counsel arranged for a psychologist to examine Wiggins. *Id*. at 523. The psychologist concluded that Wiggins "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder." *Id*.

Although we agree with Gray that his psychologist's report was similar to Wiggins's report, we do not agree that the psychological report is what the Supreme Court relied upon to conclude that reasonable counsel would have conducted further investigation into Wiggins's background. In *Wiggins*, the Supreme Court explained that a presentence report and Social Services documents gave some indication of Wiggins's horrible childhood. *Id*. at 523–25. The Supreme Court found that the limited scope of counsel's investigation was unreasonable in light of what counsel discovered in those documents—not with respect to the contents of the psychologist's report. *Id*. at 525. The Social Services documents revealed that Wiggins's "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Id*. Based on this information, reasonably competent counsel should "have realized that pursuing these leads was necessary to making an

informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." *Id.*

Additionally, however, the Supreme Court also recognized that it was standard practice in Maryland in 1989 to obtain a social history report. *Id.* at 524. Indeed, although the Public Defender's office had funds available to pay a forensic social worker, Wiggins's counsel failed to request such a report. Thus, the Supreme Court found counsel's failure to adequately investigate Wiggins's family and social history in pursuit of mitigating evidence constituted inadequate performance. *Id.* at 534.

In the instant case, Gray asserts that his counsel's only contact with his family was one interview with Gray's mother prior to trial. That assertion cannot be entirely correct because Rosa Lee Gallapsy, Gray's mother's first cousin, testified at Gray's sentencing hearing.    Although Gray contends that his counsel did an inadequate investigation into his family and social history, without affidavits from defense counsel, we are not certain of the full extent of counsel's investigation. Thus, we are at a disadvantage in determining the reasonableness of the scope of the investigation, which is the focus of the performance prong inquiry. *Wiggins*, 539 U.S. at 522–23. Further, without statements from counsel, we can only speculate about the basis for their strategic decisions made with respect to putting on their case in mitigation at sentencing. The Supreme Court has explained that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be the case, that course should be followed." *Strickland*, 466 U.S. at 697. Because we find it easier to dispose of the instant claim based on lack of prejudice, we turn to the prejudice inquiry.

B.    Prejudice Prong

In the context of a claim that counsel failed to discover and present mitigating evidence, to determine whether a petitioner has shown the required

prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. Thus, we will first set forth the mitigating evidence admitted at trial, the mitigating evidence Gray has submitted during habeas proceedings, and the aggravating evidence presented at trial. Then we will reweigh all the mitigating evidence against the aggravating evidence to determine whether Gray has shown that, had counsel presented all the available mitigating evidence, there is a reasonable probability that a juror would have found that the mitigating evidence outweighed the aggravating evidence.

>          1.    Mitigating Evidence Presented at Sentencing

Rosa Lee Gallapsy, Gray's mother's first cousin, testified at Gray's sentencing hearing. Gallapsy testified that she had known Gray "all his life." Gallapsy's son and Gray were friends and Gray was "always down to [her] house, or we [were] over to his house." She further testified that she knew Gray well and had never seen him behave violently. She described Gray as "respectable" and "just a normal child."

In addition to Gallapsy, Gray's counsel called Louise Bradley to testify at sentencing. She testified she had known Gray for twelve years and that he was "in [her] house every day" and her grandson went to school with Gray. She described Gray as "just a real nice young man, because [she] didn't have any trouble whatsoever out of him."

Gray's counsel also called Roosevelt Jones, a local minister, who testified that he owned a body shop business. Gray would stop by the shop and talk to Jones. Gray "never gave [him] any trouble." Jones never observed Gray being violent but he "heard people talking."

Gray's counsel next called Hattie Morgan, who lived next door to Gray's parents. She testified that Gray had "been in the neighborhood all his life." Morgan had known Gray "all his life." Morgan testified Gray "was real nice and

polite and never bothered nothing [she] had or said anything to [them]." Gray was a "normal boy" and never violent.

Finally, Gray's counsel called Annie Tatum, Gray's mother, to testify at sentencing. Tatum testified that her son was "normal." He was "not rebellious" or violent. Tatum and Gray's father separated when Gray was six years old and divorced several years later. Gray "couldn't really deal with it." His parents' separation adversely affected his behavior at school. Gray "would always do things that would disturb the class, so that he could go to the office." The principal "would say [Gray] wasn't no problem" if he stayed in the office. Tatum asked the jury to give her son "[l]ife imprisonment rather than death."

### 2.    Mitigating Evidence Not Presented at Trial

#### a.    Lay witnesses

In addition to the testimony offered in mitigation at sentencing, Gray contends that counsel should have called the following witnesses: his three sisters, Stephanie Wilson, Melissa Jones, and Yolanda Wheaton; and Ola Jones, who had been a teacher at Gray's school. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

First, we note that Gray did not provide an affidavit from either Melissa Jones or Yolanda Wheaton indicating that they would have testified at his trial. Instead, with respect to those two uncalled witnesses, Gray has provided affidavits from Tomika Harris, an investigator, and Deirdre Jackson, a paralegal, both of whom were working for Gray's habeas counsel. Although these affidavits contain hearsay statements that Gray's sisters made about Gray, there is no statement from the sisters providing that they would have

11

testified at Gray's trial. This record, therefore, does not allow us to conclude that these two sisters would have testified as witnesses at Gray's trial. *Day*, 566 F.3d at 538; *see also Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992) (explaining that this Court is "loathe to accept the self-serving statement of habeas counsel as evidence that other persons were willing and able to testify" in mitigation at a defendant's trial).[4]

Gray did submit an affidavit executed by Ola Jones. In her affidavit, Jones does not state that she would have been available to testify at Gray's trial. In any event, Jones does not provide much mitigation evidence in her affidavit. She states that Gray was enrolled in the special education program sometime "between the grade of 4th and 8th." Jones did not know Gray's IQ score but stated that "he had to have had a learning disability or he would not have been placed in the special education program." Jones referred to Gray as a "loner" and said she witnessed him "having tantrums in class and in the hallway."

Stephanie Wilson, Gray's older sister, did execute an affidavit; however, she did not expressly state that she would have testified on Gray's behalf at his trial. She did state that she "never was interviewed by any of [Gray's] attorneys and I feel that they did not do all that they could have done to represent him in court." Although we are not persuaded that this statement carries Gray's burden of demonstrating that Wilson would have testified at his trial, we will assume for purposes of this appeal that she would have done so. Wilson's affidavit also provided that, as a child, Gray could not take care of himself or do basic chores. He did not like school and had few friends. Also, he had difficulty sleeping, exhibited impulsive behavior, and could not maintain employment.

As set forth previously, Gray's mother, Annie Tatum, did testify during sentencing at his trial. Nonetheless, Gray contends that counsel should have

---

[4] We note that these two sisters' hearsay statements are similar to the statements of Gray's mother, Annie Tatum, and third sister, Stephanie Wilson, which are discussed below.

questioned Tatum about his childhood behavioral problems, his placement in the special education program, a psychological evaluation of him, and his inability to attend to basic chores or hold employment.

### b.    Mental Health Center Records

In addition to these affidavits, Gray submitted records obtained from the Weems Community Mental Health Center. Gray contends that counsel should have offered evidence from the records in mitigation at sentencing. He also contends that, based on these records, counsel should have moved for the appointment of a psychiatric expert to help develop the evidence for presentation at sentencing. These records show that when he was ten years old his mother brought him to the center because he had been "[e]xhibiting continual violent behavior at school and expressing anger inappropriately."[5] Gray's mother reported no problems at home but she had received complaints from the school about his behavior. She also reported that he had no developmental problems and had a "normal childhood." Gray's mother also thought that his behavior at school may be related to his parents' marital problems. The social worker indicated that Gray appeared healthy and was "quite well-behaved during [the] interview." The mother was given behavioral management techniques to use with Gray. Gray received both individual and family counseling. After Gray's behavior improved and stabilized, he was discharged from treatment. A year later, Gray was referred to the center because he had been stealing from family

---

[5] Also contained in these records is a letter from Gray's principal to his mother. It provides as follows:

> [Gray] is suspended Thursday, December 2, 1982. [Gray] went into a classroom without permission and hit a girl student in the face.
>
> I am suggesting that you discuss [Gray's] continual violent behavior at school. He is too loud and easily loses his temper. This usually results in a physical outburst with [Gray] hitting, kicking or choking someone. This type of behavior will not be tolerated.
>
> Please come to school Friday with [Gray] for a conference.

13

members and had behavioral problems. The listed diagnosis was "Conduct Disorder, Socialized, Non-aggressive." Gray was able to complete a restitution plan, and his mother followed through with a behavior management plan.

Several years later, sixteen-year old Gray returned to the center after he shoplifted a jacket. Gray's diagnosis was listed as "Conduct Disorder, Soc. Aggressive." His mother reported that Gray had been suspended from school twice and that, during middle school, she had had several conferences due to his "rebelling against the authority of his teachers." The social worker noted that Gray had a "blank affect and a hesitant manner." The notes also provide that Gray did not appear depressed and gave no indication that he understood the "gravity of his situation. Memory is intact. He is probably functioning in a borderline intellectual range." Although Gray was scheduled for counseling, his subsequent arrest for theft precluded the treatment.

### c.    Psychologists' Reports

Gray also submitted to the district court an affidavit executed by Daniel H. Grant, Ed.D, a psychologist who reviewed Gray's psychological record, including Dr. Stanley's report, school records, testimony from Gray's sentencing hearing, and the affidavits that Gray submitted during habeas proceedings. In his affidavit, Dr. Grant criticized Dr. Stanley's report (which had been done prior to trial),[6] stating that Dr. Stanley's "opinions were inconsistent with [Dr.

---

[6] As previously set forth, Dr. Stanley's report provided that Gray had an IQ score of 80. The report also provided that Gray "sees the world in an overly personalized, peculiar and idiosyncratic fashion. This suggests he will have difficulty maintaining adequate social relationships for an extended period of time." Various anxiety and depression tests were administered and his scores were consistent with marked depression. The report stated that Gray had "suicidal ideation, poor self-concept, and much hostility turned inward." Dr. Stanley recommended that Gray be placed on suicide precautions. Gray reported to his examiners that "Sexually, I like older women."

Additionally, in light of a possible learning disability and self-reported forgetfulness, a neuropsychological battery was administered. Gray's memory functioning was somewhat lower than his IQ, suggesting some genuine memory issues. Dr. Stanley concluded that Gray likely does have an Attention Deficit Disorder. Gray's low scores on the Stroop Color-Word

Stanley's] findings." Dr. Grant concluded that "the state failed to administer all of the tests necessary to determine whether some sort of neurological condition either prevented Mr. Gray from controlling an impulse or prevented him from fully perceiving the wrongness of the acts for which he was convicted."[7]

Relying on Dr. Grant's above-quoted affidavit, Gray requested the district court to authorize funding for a forensic psychologist with expertise in neuropsychological testing to examine Gray and determine whether he was

---

test could indicate dyslexia or some atrophy of the prefrontal areas caused by chronic drug abuse. However, Gray's scores are "more often associated behaviorally with poor impulse control than anything else." Gray's scores on the Wisconsin Card Sorting Test were "more typical of the prefrontal dysfunction than anything else, and is often associated with poor impulse control as well as Attention Deficit Disorder." The Luria-Nebraska Neuropsychological Battery score was used to examine statistical indicators of brain dysfunction. Four of the five indicators fell within the abnormal range, indicating "a fairly high likelihood of brain dysfunction, unless confounding factors such as drugs could account for the scores." The errors Gray made on that battery of tests were "quite consistent with a learning disability, probably Attention Deficit Disorder and Hyperactivity." However, Dr. Stanley could not rule out any "artifacts associated with previous use of drugs." Dr. Stanley's "overall assessment of the neuropsychological battery is that there are some abnormal scores, but they can be accounted for by a learning disability which is probably chronic and endogenous. There is no history of a clinically significant head injury. Specifically, the neuropsychological tests are consistent with Attention Deficit." The Carlson Psychological Survey indicated that Gray is "markedly antisocial," and although he may appear cooperative, "beneath this exists characteristics of impulsivity, intolerance, hostility, aggression, and irrational behavior." Dr. Stanley concluded that Gray was "disturbed," but noted that Gray's "motivation for psychological or psychiatric treatment will be remarkably low." He further concluded that Gray needed a highly structured environment.

[7] Dr. Grant's affidavit further provided that:

Those tests did not fully investigate whether Mr. Gray had an impaired ability to conform his conduct to the requirements of the law. They also did not take into consideration his numerous emotional and psychological problems, his difficult childhood, depression, suicidal tendencies, anxiety, learning disabilities, and low intelligence as regards their effect upon his behavior. The state expert, Dr. Stanley, performed tests primarily to determine competence to stand trial, and not determine mitigating circumstances. A neuropsychologist is needed in this case. Neuropsychological tests such as the Halstaid-Reitan and Luria-Nebraska do not appear to have been properly interpreted, regarding the existence of organic brain dysfunction and how the deficits could be mitigating.

mentally retarded. The district court granted the motion authorizing the funding, and Dr. Gerald O'Brien, a clinical and forensic psychologist, was chosen as the expert. Dr. O'Brien interviewed Gray and administered psychological tests. In the interview, Gray reported to Dr. O'Brien that he slept too much but denied any suicidal thoughts. He reported no family history of psychological or substance abuse problems. Gray stated that he had taken special education classes in fourth grade and then "tested out." He admitted to disruptive behavior in class and that he dropped out of school in the ninth grade. Gray stated that when he was 16 years old he was sent to "Youth Court" for burglary and shoplifting.

Dr. O'Brien concluded that Gray's "current tested Full Scale IQ is likely to be in the 86-93 range."[8] On the screening test for the Luria-Nebraska Neuropsychological Battery, Gray had an error score of 5, "well within the cutoff score (8), suggesting that if the entire neuropsychological test battery were administered he would be unlikely to show significant specific or generalized neuropsychological deficits." Gray achieved a score of 14 (out of 21) on the 21 Word Test. That is considered a "normal result." With respect to the Personality Assessment Screener, Gray's "overall score was within the normal range, suggesting low potential for significant emotional or behavioral problems." Dr. O'Brien also administered the Personality Assessment Inventory for comparative purposes and Gray produced a "generally valid profile. The clinical results included a significant elevation on one scale only, suggesting suspiciousness, hostility, and hypervigilance in his relations with others." However, Dr. O'Brien attributed the elevated scale to Gray's current

---

[8] With respect to the WAIS-III test, Gray scored a Verbal IQ of 89, Performance IQ of 90, for a Full Scale of 89. These scores placed his "overall intellectual functioning in the low average range." Gray scored within the average range on the SHIPLEY test, which translated to an estimated (WAIS-R) IQ of 96. With respect to the WRAT4 test, his achievement scores were: reading (90) at grade level 10.2; and sentence comprehension (87) at grade level 9.9.

16

circumstances on death row—not significant psychopathology.  Further, Dr. O'Brien concluded that Gray "is currently functioning in the low average range intellectually, even allowing for lower Flynn-corrected test scores from 1995, and second-hand reports of past school performance problems. . . . There are also no indications of significant emotional or psychological difficulties that cannot be explained by his current environment and legal situation."[9]  Dr. O'Brien concluded that Gray's current intellectual functioning falls in the low average range, but "he may have functioned at a slightly lower level" prior to incarceration.  Gray is not considered mentally retarded.  Various "test results and clinical observations do not indicate significant emotional or psychological difficulties, although there are suggestions of current suspiciousness and hostility in his dealings with other people."

### 3.    Aggravating Evidence at Trial

At the beginning of the sentencing phase of Gray's trial, the prosecutor moved "to allow the State to bring forward all evidence that was produced at the guilt phase of the trial and to incorporate that evidence in the sentencing phase, to include all witness testimony and all exhibits that were introduced through these witnesses." The trial court granted the motion. The aggravating evidence offered during the guilt phase of trial included evidence that Gray kidnapped 79-year old Grace Blackwell from her home, forced her to drive to her bank to withdraw $1200, raped her, shot her twice with a shotgun, and ran over her with her vehicle.  Blackwell's car had blood "all over the passenger side . . . both inside and outside." *Gray*, 728 So.2d at 43.  The front of the car had been damaged and "[t]here was blood and tissue on the front, across the hood,

---

[9] The "Flynn Effect" refers to the theory that average IQ scores in populations artificially increase over time. *In re Salazar*, 443 F.3d 430, 433 (5th Cir. 2006).  However, the Flynn Effect "has not been accepted in this Circuit as scientifically valid." *In re Mathis*, 483 F.3d 395, 398 n. 1 (5th Cir. 2007).  The Mississippi Supreme Court has not addressed the scientific validity of the Flynn Effect.

windshield, and down the passenger side of the vehicle." *Id.* Blackwell's body was found lying beside the road. As the district court noted, the injuries to Blackwell's body were horrific. "She had lacerations on her leg and facial area, severe wounds to her mouth and back side of her head, along with a gash to the back of her head." *Gray,* 728 So.2d at 43. "The lethal injury was a contact shotgun wound to the mouth." *Id.* The non-lethal shotgun injury was to the left side of her face, chest and left arm. *Id.* "There were multiple small entrance wounds indicating secondary missile pattern injury." *Id.* On the right side of her body she had "large scrapes of skin as if she slid on a hard object." *Id.* at 44. "There was also an abrasion or scrape of one inch to the labia majora or vaginal vault, which indicated forceful sexual penetration." *Id.* There was testimony that "[i]t would have taken a period of time to die, as the bleeding was from secondary vessels." *Id.*

During the sentencing phase, the prosecutor called three witnesses, the victim's only child, Gerry Martin, and the victim's two granddaughters, Crystal Moulds and Amber Arnold. The witnesses were all very close to the victim. They testified that Blackwell had lived with her daughter and helped her raise her children. They testified that Blackwell was a devoted mother, grandmother, and great-grandmother who helped them in anyway she could. They testified about the pain of losing her and how it had devastated the family. They were deeply saddened that her great-grandchildren would grow up without her.

#### 4.    Reweighing of Evidence

As previously set forth, in determining whether Gray has shown prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. In view of the aggravating evidence with respect to the murder, kidnapping, and rape, we are not persuaded that, had defense counsel presented the currently proffered evidence

in mitigation, there is a reasonable probability of a different outcome.[10]  We certainly are not persuaded that the Mississippi's Supreme Court's conclusion that the new evidence "would have had little if any persuasive effect on the jury in mitigation" is unreasonable.  *Gray*, 887 So.2d at 168.

The new evidence portrays Gray as either dull normal or low average intellectual functioning.  He behaved inappropriately and sometimes violently at school.[11]  Gray was in special education for an unspecified period of time before he "tested out."  He quit school after ninth grade.  He shoplifted and stole from his family.  He was unable to accomplish basic chores and had learning disabilities such as Attention Deficit Disorder and mild dyslexia.  At the time of trial, he was depressed and having suicidal thoughts.  Gray is "markedly antisocial" and "disturbed," with an "undeveloped or underdeveloped conscience."  Although Gray points to Dr. Grant's affidavit criticizing Dr. Stanley's report, Gray fails to even acknowledge Dr. O'Brien's report which concludes that Gray was unlikely to show significant specific or generalized neuropsychological deficits. Dr. O'Brien found that Gray had low potential for significant emotional or behavioral problems.  Unlike the expert opinions relied upon by Gray, Dr. O'Brien had actually interviewed Gray and administered the tests.  Although Gray contends that an investigation would have revealed severe psychological or neurological problems, Dr. O'Brien's conclusions refute that contention.  *Cf. Blanton v. Quarterman,* 543 F.3d 230, 239 (5th Cir. 2008) (explaining that

---

[10]  In other words, even if we were reviewing this claim de novo, we would find no *Strickland* prejudice.

[11]  At trial, his mother testified that her divorce from his father was difficult for Gray. She testified that it affected his behavior at school in that he "would always do things that would disturb the class, so that he could go to the office."  However, she did not testify as to his violent behavior.

petitioner's claim of organic brain damage was "persuasively rebutted" by the state's psychiatrist).[12]

Gray's mother's affidavit provided that Gray could not maintain employment or accomplish basic chores. He had difficulty dealing with his parents' divorce and behaved violently at school on occasion. This evidence in mitigation pales in comparison to the type of powerful mitigating evidence that the Supreme Court has opined would have a reasonable probability of causing a juror to find that the mitigation evidence outweighed the aggravating evidence. *Wiggins*, 539 U.S. at 535; *Williams,* 529 U.S. at 395; *see also Blanton,* 543 F.3d at 239 (explaining that "the mitigating evidence presented by [petitioner] during the state habeas proceeding was not nearly as strong as that submitted by petitioners in recent cases in which the Supreme Court has found prejudice"). For example, "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." *Wiggins*, 539 U.S. at 535. Wiggins was at times homeless and had "diminished mental capacities." *Id.* The Supreme Court explained that Wiggins had the "kind of troubled history" it has "declared relevant to assessing a defendant's moral culpability." *Id.* Concluding that the available mitigating evidence "'might well have influenced the jury's appraisal' of Wiggins' moral culpability," the Supreme Court held that he had shown *Strickland* prejudice. *Id.* at 538 (quoting *Williams*, 529 U.S. at 398).

---

[12] As previously noted, Gray also contends that counsel's failure to request a court-appointed expert to assist in presenting the case in mitigation constitutes ineffective assistance. However, in the proceedings below, the district court authorized funds to have an expert conduct further neuropsychological testing. Gray's counsel had Dr. O'Brien conduct the tests, and his conclusions demonstrate that Gray cannot show prejudice based on counsel's failure to request a court-appointed expert.

Similarly, in *Williams*, the Supreme Court described Williams' childhood as "nightmarish." 529 U.S. at 395. "Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings." *Id.* "Williams had been severely and repeatedly beaten by his father [and] had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home)." *Id.* Additionally, "Williams was borderline mentally retarded and did not advance beyond sixth grade in school." *Id.* (internal quotation marks and citation omitted). There were prison records available demonstrating that Williams had assisted in cracking a drug ring in prison and returned a guard's missing wallet. *Id.* at 396. In light of all the available mitigating evidence, the Supreme Court concluded that Williams had shown a reasonable probability of a different outcome at sentencing. *Id.* at 399.

In the instant case, there is no allegation of abuse. Indeed, in the proffered mental health records, Gray's mother describes his childhood as "normal." Moreover, Gray cannot show prejudice because much of the new evidence is "double edged" in that it could also be interpreted as aggravating. *See Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000) (holding that petitioner could not demonstrate *Strickland* prejudice because the evidence was "double edged in nature"). For instance, Dr. Stanley described Gray as "markedly antisocial" and "disturbed." The records list Gray's diagnosis as "Conduct Disorder, Soc. Aggressive" and provide evidence that he hit a girl in the face in the classroom. We are not persuaded that Gray's new evidence has a reasonable probability of influencing the jury's decision regarding his moral culpability.

We recognize that reweighing the evidence is a difficult inquiry. *See Tucker v. Johnson,* 242 F.3d 617, 623 (5th Cir. 2001). Nonetheless, we are not

No. 09-70021

persuaded that the Mississippi Supreme Court's conclusion that the newly proffered evidence does not demonstrate prejudice is unreasonable.

IV.   CONCLUSION

Accordingly, for the above reasons, the district court's judgment is AFFIRMED.